ESTATE of John J. CONNELLY, Sr., Deceased, and Ellen C. King, Executrix, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. 74–357.

United States District Court, D. New Jersey.

Aug. 5, 1975.

Maurice H. Connelly (Adams, Adubato, Tafro & Connelly), South Orange, N. J., for plaintiffs.

Scott P. Crampton, Asst. Atty. Gen., Jerome Fink, Atty. Tax Div., Vicki G. Cheikes, Atty., Tax Div., Washington, D. C., Jonathan L. Goldstein, U. S. Atty., by George E. Mittelholzer, Asst. U. S. Atty., Newark, N. J., for defendant.

## OPINION AND ORDER

BIUNNO, District Judge.

### Nature of Case

In this case, Connelly sues to recover the sum of $3,200., plus statutory interest from June 7, 1968, paid under protest as the result of an assessment calculated on the basis of including in Connelly's taxable estate the commuted value of installments payable to decedent's son under a group life insurance arrangement provided by Connelly's former employer.

The theory of the assessment is that Connelly possessed "incidents of ownership" within the meaning of IRC § 2042, 26 U.S.C. § 2042.

Claim for refund was duly filed, and IRS informed the executrix that it would be denied. This suit followed, jurisdiction being under 28 U.S.C. § 1346(a)(1).

The matter was submitted as though on cross-motions for summary judgment, on stipulated facts. The court encountered some obstacles to resolution on the submissions, and by Letter Opinion and Order dated February 28, 1975, and supplemental Memorandum dated April 10, 1975 additional materials were requested and supplied. The present disposition is on the basis of the full submissions as though cross-motions had been formally refiled.

## Facts

Connelly died in Jersey City, New Jersey, on November 16, 1964. By the provisions of the group term life contract to be discussed, his son, Robert, became entitled to the single sum of $375., and to a monthly annuity of $248.44 for a period of 50 months. The aggregate of these amounts comes to $12,797.

In general, under the terms of the contract, benefit payments went to the surviving spouse, if any. If there were no surviving spouse, or if a surviving spouse did not live long enough to receive all the payments called for, the payments were made, in order, to other "preference relatives", being minor children first and decedent's parents next. If there were none of these, payments were to go to other "dependent" relatives who met contract requirements.

Connelly was a widower at death, and hence left no surviving spouse. The payments to Robert accrued because he was the only member of the class next entitled in the absence of a surviving spouse.

Also, it should be noted that at death Connelly was retired from employment; hence he could not, at that time, quit his job and terminate group term coverage or convert it, as is sometimes possible under arrangements of this kind.

The amount and number of the monthly payments were determined by a formula, not necessary to detail, which fixed those elements without regard to the identity, number, age or other characteristics of beneficiaries. The sum and substance of the provisions was for the payment of a fixed term annuity. But if no eligible beneficiaries lived to receive all the payments, they ended.

Connelly could not pick and choose beneficiaries, or cut off beneficiaries. He could not name his estate, or creditors, as beneficiaries.

The only thing Connelly could do, and he could only do it if he had a surviving spouse, was to elect to have the monthly payments, otherwise to be made to his widow, reduced by a selected percentage, to which there were contract limitations. Thus, for example, if the payments were otherwise to be $240. a month for 50 months, he could arrange for the payments to be at $160. a month. In that event, the other $80. a month had to be set aside at interest (guaranteed to be at least 2.5%) for the widow.

If the widow lived out the 50 months, the sum set aside, assuming interest credited monthly, would have come to an aggregate value of $4,211.14 by the court's calculations using standard financial formulae. This sum would then be applied to continue the payments of $160. as long as the balance so set aside held out. This would cover 27 additional payments plus a small balance of about $16., assuming interest at 2.5% as calculated by a standard direct amortization formula.

If Connelly had a surviving spouse (which he did not) and did not arrange to reduce the amount of each monthly payment and correspondingly increase their number, his surviving spouse could do the same thing. This is because the contract says so, and would not depend on Connelly's transferring anything.

If this limited modification were made (whether by Connelly or his surviving spouse), it would in no way modify the aggregate benefits that the widow would receive.

Thus, under the terms of the contract, if she lived only 25 months, the $80 a month set aside for her over that time ($2,050.81 with accumulated interest at 2.5% per year compounded monthly) was hers; it did not pass to the next class of beneficiary. Under these facts, the next beneficiary would receive the remaining 25 payments at $240. a month. Neither Connelly nor the next beneficiary could change that.

Conversely, if she lived for 60 months, all of the 50 payments would have been made; $160. per month to the widow and $80 per month into her account, and 10 months or $1,600, of the account would have been paid to her. Under this set of facts, nothing would be payable to the next class of beneficiaries. Whatever the balance in the widow's account was then, it would be paid, to her estate. Neither Connelly nor his widow could change that.

At the time of Connelly's death, the law of New Jersey did not allow an insured under a group term life policy to make assignments. The present law, NJSA 17B:24–4 does. This statute is a reenactment by revision of NJSA 17:34–32.3, enacted as NJPL 1969, c. 97, repealed (as part of the revision) by NJPL 1971, c. 144, effective January 1, 1972.

What has been said about changing the amount and stretching out the number, of the payments, whether done by Connelly or the beneficiary, applies, under the contract, only to a surviving spouse. This kind of arrangement was not allowed where the beneficiary was in another class, such as a son or a parent.

Since this was a group term life contract, there were no loan values, and no surrender values. Its terms did not allow for change in beneficiary, and Connelly could not convert to individual insurance.

The stipulation of additional facts received April 9, 1975 (and which stimulated the court's supplemental Memorandum of April 10, 1975) asserted that Connelly, at death, had two rights he could have exercised: one, a right to alter the amount and number of monthly payments, and, two, the right to "assign" that right (Stip., par. 5). It was also stipulated that these rights obtained regardless of whether the beneficiary was the surviving spouse or the "qualifying preference relative" (i. e., minor children or parents). Stip., par. 7.

The court's inspection of the policy contract showed these "facts" not to be correct, and this matter was raised in the supplemental Memorandum of April 10, 1975. The United States subsequently conceded, by letter and by its further brief, that these stipulated "facts" are wrong.

■ Ascertainment of "facts" like these are matters of interpretation of the contract, to be determined by the court; the parties are free to argue for any interpretation they feel they can legitimately support; but they cannot stipulate them to be otherwise than the plain language of the contract discloses. See *U. S. v. Felin*, 334 U.S. 624, 68 S.Ct. 1238, 92 L.Ed. 1614 (1948).

This erroneous "stipulation" is a matter of concern to the court because the United States was fully aware of the contract terms by reason of the litigation of the same issue (under somewhat different circumstances) in *Lumpkin*, to be discussed later. It had previously dredged out and submitted, at the court's request, the briefs on both sides in both the Tax Court and in the Court of Appeals (Fifth Circuit) in *Lumpkin*, and it is extremely difficult to understand how this mistaken "stipulation" of facts that were not true could have been made.

Taking the most aggressive and advantageous stance for one's position is a

natural one for any party, given the nature of the adversary process. But counsel for a party, especially the United States, have a higher duty to the court, and a duty to the taxpayer (whose adversary means are far from equal in most cases) to be candid and fair.

The "facts" in regard to what could be done under the contract have been determined by the court by thorough inspection of the contract itself, and what has been outlined above supersedes any stipulation to the contrary.

In view of these clarifications, the United States now rests its position on one item. This is a provision, in the contract, to the effect that

"An election other than that specified above may be arranged during the lifetime of a covered individual with respect to monthly installments becoming payable to the covered individual's preference relatives if the covered individual, the employer by whom employed and the Society mutually agree thereon."

There is also another provision, applicable after death, which reads:

"An election other than that specified above may be arranged if the employer by whom the covered individual was last employed, the spouse and the Society mutually agree thereon."

This description of the policy provisions and their highly restrictive nature, may seem to be peculiar in light of their difference from commonly known terms of both individual and group life insurance contracts. The reason for this is that this life insurance contract was part of a Survivor Benefit Plan adopted by the employer for the survivors of its employees and retired employees. The plan is entirely voluntary on the part of the employer, is paid for entirely by the employer, and it is subject to the right of the employer, acting unilaterally, to amend, suspend or terminate the plan in whole or in part as to all employees or any class or group of employees.

The cost of the plan (actually provided by a group of affiliated employers and successors) is chargeable to the particular employer, with provision that the benefits be payable by that employer unless insured under a contract of insurance.

The purpose of the plan is expressly stated to be "to provide benefits over and beyond those payable by law to qualifying survivors of deceased employees, ex-employees and annuitants of this Company and its participating affiliates."

Before the enactment of the social security law, benefits for survivors of employees and retirees were provided by enlightened employees through various means. One of the earlier plans is described in *Dimock v. Corwin*, 19 F.Supp. 56 (1937), involving much the same problem as here in respect to an annuity system rather than an insurance policy (the appellate opinions in *Dimock* did not involve that question but two independent and separate matters).

In any event, the statement of purpose of the plan, taken together with the provisions for integrating the plan benefits with social security benefits, makes it clear that the plan, as well as the insurance which the employer obtained to provide the payments, is designed to supplement government social security benefits. In periods during which the survivor is not yet eligible for social security (i. e., due to age), the full amount of the benefits comes from the insurance payments. When the survivor begins to draw social security benefits, the plan provides the difference between the social security benefits and the level of 37.5% of monthly normal earnings at the time of retirement.

The plan involved here was adopted to be effective July 1, 1947, and was amended effective April 27, 1950 and July 1, 1950. An insert on the front cover of the plan booklet, edition of July 1, 1950, stated that:

"Effective April 20, 1955, Standard Oil Company (N.J.), as permitted by

Part VII(b) of the Plan, arranged to provide through a group life insurance policy most of the benefits to which survivors and annuitants are eligible under the Plan  .  .  .  .  Any Plan benefits not included under the insurance policy will continue to be payable directly by the Company."

This history is illuminating.  Before the 1954 Code, survivor benefits provided unilaterally by an employer through an annuity were not includible in the gross estate of a deceased employee or retiree, as shown by the decision in *Dimock, supra.*

Annuities, including those to survivors of employees and retirees, came to be dealt with explicitly for the first time under the 1954 Code, by sec. 2039, which was "new".  Sec. 2039(a) provides for inclusion in the gross estate of the value of the annuity to the beneficiary.  Sec. 2039(b) makes inclusion applicable only to the extent of contributions made by the decedent; and also declares that contributions made by an employer are to be considered as though made by the decedent if they were made "by reason of" his employment.  Sec. 2039(c) excluded from sec. 2039 and "any other provision of law" annuities under a "qualified plan".

In enacting this new section, the Congress excepted from its operation payments to beneficiaries "as insurance under policies on the life of the decedent."

By letter of April 28, 1975, obtained in response to inquiry requested by the court, the employer stated that the benefits under the group term life policy involved were not covered under a "qualified" pension and profit sharing plan within IRC secs. 401(a) and 501.

Thus, until the 1954 Code, the employer provided to survivors annuity benefits that were not part of the decedent's gross estate under the then law.  With the enactment of sec. 2039, the annuity benefits would be part of decedent's gross estate, and so the employer covered the payments by a life insurance policy, thus removing them from the effect of sec. 2039 and subjecting them to sec. 2042.  *Billings* was then the only pertinent decision on the books, it had been acquiesced in for 17 years and no change was made in sec. 2042 by the 1954 Code.

Thus, the outcome here will determine whether the employer was successful in providing benefits to survivors in a way that did not require their inclusion in a decedent's gross estate, as had been the case before the 1954 Code.

If it did not succeed, the result is not likely to have any significant effect on the estates of employees or retirees of the employer.  When *Lumpkin* came down, the employer was free to make unilateral changes in both the Plan and the policy, to eliminate the features relied on by *Lumpkin.*  Thus the result in *Lumpkin* and in cases that follow it will affect only those estates of decedents that were still open when *Lumpkin* was decided, or of those who died thereafter and before December 27, 1966, when the record shows that the employer eliminated any options in a deceased employee or retiree.

*The Issue*

The issue here turns on the applicability of § 2042 of the Code.  Briefly, that section requires inclusion in the gross estate of a decedent of the amount receivable from insurance policies on the life of the decedent under certain circumstances.

One circumstance is when the amount is receivable by the "executor" (i. e., by the decedent's estate).

The other is when the amounts are receivable by any other beneficiary if "the decedent possessed at his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person."

The section goes on to say that an "incident of ownership" includes the existence of a reversionary interest but only if its value is more than 5% of the value of the policy immediately before death.

The corresponding regulations, Reg. 20.2042–1 explain, among other things, that

> . . . if the decedent did not possess any incidents of ownership, no part of the proceeds would be includible in his gross estate under § 2042.

> . . . "incidents of ownership" is a term not limited to ownership of the policy in the technical legal sense; it generally refers to the "right of the insured or his estate to the economic benefits of the policy."

> . . . the term includes (for example) the power to change beneficiaries, to surrender or cancel the policy, to assign the policy, to revoke an assignment, to pledge the policy for a loan, or to obtain from the insurer a loan against the surrender value of the policy, etc.

As will be observed in the discussion of the law, this concept has been regarded as applicable to aspects that are something more than insubstantial, taken together as a bundle.

*The Law*

It is worth reviewing briefly the various provisions of the law as applied to life insurance over the years, as context for the present issue.

Before 1942, life insurance proceeds were to be included in the decedent's gross estate only if they were from policies taken out by him on his own life. See Revenue Act of 1926, sec. 302(g) and 1939 Code, § 811(g). This simple test was no doubt intended to differentiate the usual circumstances from those where the insurance is taken out by others having an insurable interest, such as by stockholders or partners under a buy-and-sell agreement, or by an employer on a "key-man", and the like. But the presentation of problems of interpretation, particularly in hybrid situations, led to development by the courts of two tests: "payment of premiums", and possession of "incidents of ownership."

The Revenue Act of 1942, by § 404, eliminated the test of who took out the policy and substituted the two tests developed by the cases. The committee reports at the time included examples of "incidents of ownership" essentially the same as those now found in Reg. 20.-2042–1 (except for the example of a power to change beneficiaries in a corporation of which decedent is the only shareholder). See *U. S. v. Rhode Island, etc.*, 355 F.2d 7, at 10 (CA–1, 1966).

The Revenue Act of 1954, by § 2042 (which applies here) deleted the "payment of premiums" test and left the "incidents of ownership" as the sole test.

In 1937, the Board of Tax Appeals decided *Billings v. Comm'r.*, 35 B.T.A. 1147, involving a large number of life insurance policies, which fell into 3 groups:

> . . . 32 policies, with proceeds of more than $500,000. payable to the widow, as to which decedent had the right up to his death, to change the beneficiaries; these were includible in the gross estate (except for $40,000. excluded under the law in effect).

> . . . 3 policies, split up from 1 policy originally payable to decedent's estate, and made payable to 3 named beneficiaries, this change being made a little more than 5 months before death; these were includible as transfers made in contemplation of death.

> . . . 3 policies, totalling some $47,000., in which there was no right to change the beneficiary, but in which decedent could select one or another settlement option (other than lump sum) without the beneficiary's consent, these being of the usual kind such as fixed-term installments, retention at interest, installments for the life of the beneficiary based on the beneficiary's life expectancy, and variations; these were ruled not includible in decedent's gross estate.

The first group of 32 policies was ruled includible, even though taken out by decedent before the effective date of the Revenue Act of 1918. The opinion observed that:

"This Board and the courts have long held that, regardless of the date on which the policies were taken out, the proceeds on a decedent's life are properly includible in his gross estate where he has retained until his death the power to change the beneficiaries." (citing cases).

The split group of 3 policies was set up and assigned to the beneficiaries named in place of the estate within 6 months of death, at a time when decedent was suffering from a chronic cardiac valvular disease of some 6 years' duration. These assignments were held to be transfers in contemplation of death.

The last group, for which there was no right to change beneficiaries and no transfer, was ruled not includible. The Board reviewed *Industrial Trust Co. v. U. S.*, 296 U.S. 220, 56 S.Ct. 182, 80 L. Ed. 191 (1935) and *Chase National Bank v. U. S.*, 278 U.S. 327, 49 S.Ct. 126, 73 L.Ed. 405 (1929), and considered the basis of the Commissioner's contention that decedent retained until death "powers of control over the economic benefits thereof sufficient to support the tax." He claimed this resulted from the option, in 2 policies, to direct retention of the proceeds at interest and payment to the beneficiary's estate at death, and the option in all 3 policies to make payment in fixed annual installments or in installments measured by the life expectancy of the beneficiary.

The Board concluded that while retention of the right to change beneficiaries, or to surrender the policy without the beneficiary's consent was a valuable interest in the policy which may be properly includible in the gross estate under *Chase National Bank*, the existence of the settlement options did not amount to such an interest. The Board said:

"The mere right to say when the proceeds of the insurance proceeds should be paid to the beneficiary does not amount to a control of the proceeds. They irrevocably belonged to the beneficiary from the date the policies were taken out" (35 BTA at 1152)

The Commissioner acquiesced in the decision in *Billings*, Ruling XVI–51–9097, Cum.Bull. 1937–2, p. 3, and that acquiescence remained until it was "withdrawn and nonacquiescence is substituted therefor", Cum.Bull. 1972–1, p. 3, this change having taken place after the brief of the United States was filed with the Court of Appeals in *Lumpkin*, as noted hereafter.

In the same publication, Revenue Ruling 71–463 (Cum.Bull. 1971–2, 333) was withdrawn; see Cum.Bull. 1972–1, 307). That ruling held that the proceeds of life insurance from a policy owned by a closely-held corporation controlled by the insured-decedent is includible in his gross estate. It was withdrawn because the provision to that effect in Reg. 20.-2042–1(c)(2), insofar as it included that power within the term "incidents of ownership", was being reconsidered. *Idem.*

In the same publication, Cum.Bull. 1972–1, 307, Revenue Ruling 69–54 was modified by Revenue Ruling 72–307. The earlier ruling, under "situation 1" held that insurance proceeds from a group term life insurance policy were includible in the gross estate if the insured could terminate the coverage by quitting his job. The new ruling was that in these circumstances the power was not an "incident of ownership" because the examples given in Reg. 20.-2041–1(c) "concern powers that directly affect the insurance policy or the payment of its proceeds without potentially costly related consequences."

When Congress enacted the 1942 Code, which adopted the judicially developed tests, including "incidents of ownership", it was presumably aware of the

decisions of *Industrial Trust, Chase National Bank,* and *Billings.* So, also, when it amended in the 1954 Code.

In the examples given in the committee reports, and now found in Reg. 20.-2042–1(c), the expressions reflect an awareness of the nature of the life insurance contract and of the usual provisions of the policies. These usual provisions include the power to change beneficiaries, the power to surrender or cancel the policy (ordinarily for its cash surrender value), the power to assign or revoke the assignment, the power to pledge the policy as security for a loan, and the power to borrow from the insurer on the policy. Such provisions are very old in life insurance, and all of them reflect economic benefits that can be realized by the insured.

Also very old are provisions for settlement options of the kind involved in *Billings.* These, as well as others, such as joint and survivor options, life options with payments certain, life options with guaranteed refund, and the like, are extremely common and have been common for many decades.

It is significant that the power to exercise such settlement options, plain to anyone examining a policy long before 1942, was not mentioned in the committee reports and has never been listed in Reg. 20.2042. They had been expressly dealt with in *Billings* in 1937, and ruled insubstantial. The Commissioner acquiesced. The Congress, and its committees, could not have been unaware of this.

The reason for this is obvious, or should be, to anyone familiar with the nature of settlement options. All of them, in their varied forms, are actuarial equivalents of that amount which is payable at maturity in a lump sum. Their economic consequences are the same as though the maturity value were taken down and used to buy from the insurer one or another kind of annuity contract. What the installments will be on an option for 5, 10 or some other number of years, or for the life of the

beneficiary, with or without refund guarantee, are those installments that can be purchased, for the particular kind of annuity chosen, by the amount of the policy proceeds. Thus, the policy with an option of this kind exercised is, in substance, a life insurance policy followed by an annuity of one kind or another whose value at purchase is equal to the policy proceeds.

Because of this equivalence, it is plain that the presence of settlement options of the usual kind, such as were involved in *Billings,* does not come within the scope of the term "incidents of ownership", which Reg. 20.2042–1 says refers generally to the "right of the insured or his estate to the economic benefits of the policy." The examples given in Reg. 20.2042–1(c) are proper examples because they fall within the scope of the general definition. Settlement options, being no more than economic equivalents of each other, and none having a higher or lower economic value, are outside the scope of the general definition. The omission of any reference to the power to select among available settlement options can only have been deliberate. Their existence and nature were too well known to support any other interpretation.

No change was made by Congress in the term "incidents of ownership" in any revenue act since 1942. It added sec. 2039 in 1954 to cover annuities, but excluded payments as insurance on a life policy. And all that time, until the Court of Appeals ruling in *Lumpkin, Billings* was on the books and acquiesced in. In the 36 years between *Billings* and *Lumpkin,* no reported cases are found in the books involving the question whether the right to select a settlement option is an "incident of ownership".

In this period of nearly 4 decades, there must have been millions of decedents with life insurance, and some significant number of them must have been covered under policies where they had no incidents of ownership of the kind

enumerated in the 1942 Committee Reports and in Reg. 20.2042, but with some kind of settlement option. The professional handbooks and reference services published over the years on the law of Estate Tax may be searched in vain for any suggestion that the existence of settlement options constituted an "incident of ownership". Countless estate tax returns must have been filed and settled on that basis.

Then came *Lumpkin.*

*Lumpkin* involved the same employer and the same group term life insurance policy as this case does. The fact differences are these: in *Lumpkin,* the decedent was still employed when he died; here, he was retired. In *Lumpkin,* the decedent was survived by a widow and he had the power to exercise a settlement option of the kind described early in this opinion; here, he was not survived by a widow but by a son, and he did not possess the power to exercise that settlement option. On the law, there is this difference: in *Lumpkin,* the decedent was found to have the right to assign the power to exercise the settlement option; here, under the law of New Jersey, he did not have that right.

*Analysis of Lumpkin*

In the Tax Court opinion, the provisions of the group term life insurance contract where reviewed, as applicable to a decedent who was employed at death and who was survived by a widow. The rights found in decedent were:

. . . the restricted settlement option described above, which applied only to a widow and which could not have the effect of transferring to any other beneficiary any benefits otherwise payable to her, nor shift to the widow any benefits otherwise payable to other beneficiaries.

. . the right to quit his job and thereby cancel the policy.

. . the right to convert the cancelled policy to an individual policy, said to arise by reason of the laws of New York and Texas.

. . . the right to assign rights under the policy.

The Tax Court ruled that none of these amounted to incidents of ownership. The settlement option was very narrow and restricted, much more so than those involved in *Billings.* The power to quit and thereby cancel the policy was without any economic benefit since it would destroy the policy and no one would receive any benefits from it. [NOTE: distinguish this from cancellation of a policy with a cash value to be paid in that event, but which is nonexistent for group term life policies]. The claimed conversion privilege was ruled not to apply because the contract was governed by Delaware law which did not provide for conversion. The right to assign rights was found to rise to no higher level than the rights assigned, and since these were found not to be incidents of ownership, neither was the right to assign them. *Lumpkin v. Comm'r,* 56 T.C. 815 (1971).

The Commissioner appealed to the 5th Circuit, and as a comparison of the briefs in the Tax Court and the Court of Appeals show, the position taken on appeal was different than that presented to the Tax Court. First, the Commissioner dropped the claims on cancellation by quitting the job and potential conversion arising therefrom.

Second, the Commissioner for the first time pressed an analogy to trust cases, namely *Lober v. U. S.,* 346 U.S. 335, 74 S.Ct. 98, 98 L.Ed. 15 (1953) and *U. S. v. O'Malley,* 383 U.S. 627, 86 S.Ct. 1123, 16 L.Ed.2d 145 (1966). Third, the Commissioner informed the court that "we are advised that the Internal Revenue Service is presently arranging to withdraw the acquiescence in *Billings*" (Brief for Appellant, p. 12, footnote 6).

The 5th Circuit reversed. In doing so, it framed the question in terms of the "right to alter the time and manner of enjoyment", and looked to both *Lober* and *O'Malley* for the proposition that elements leading to inclusion in the gross

estate there were also indicators of "incidents of ownership" under IRC § 2042.

It felt that Congress had intended to make the estate tax treatment of life insurance "roughly analogous" to that of other kinds of property. It felt that in view of this, "somewhat of an anomaly would be created" if power over the time and manner of enjoyment were enough control to activate §§ 2036 and 2038, but not enough to make it an "incident of ownership" under § 2042. *In re Lumpkin,* 474 F.2d 1092 (1973).

*The Disposition Here*

The United States urges that *Lumpkin* is sound and should be followed here, and that it is controlling. It states that no decision on point has been found in the 3rd Circuit. The court's independent research has found none.

The difficulty with this position is twofold. In the first place, *Lumpkin* is not sound and should not be followed here. In the second place, the "rights" of decedent in this case amount to either zero or at most a tinker's dam; they are not the same as in *Lumpkin.*

The *Lumpkin* decision is not sound because it rests on a rough analogy and a supposed anomaly instead of on the statute. Neither the analogy nor the anomaly was present in substance.

Neither *Lober* nor *O'Malley* can serve as precedent for the result in *Lumpkin.* This is for a number of reasons. First, the statutes there were directed expressly to the making of "any change" in respect to "the enjoyment" of the transfer, by reason of a power to "alter, amend or revoke" the transfer (former sec. 811(d)(2), now sec. 2038, involved in *Lober*), or to the reservation of a right "to designate the persons who shall possess or enjoy the property or the income therefrom" (former sec. 811(c)(1)(B) (ii), now sec. 2036, involved in *O'Malley*). Second the facts are inapposite.

In *Lober,* the decedent was the settlor/trustee. The trusts were irrevocable, but as trustee Lober had full power over investing and reinvesting the funds, and could accumulate and rein-

vest the income without restriction until the beneficiaries became 21. At that point they were to receive accumulated income. Principal could be held until age 25. But the court saw as "a crucial term" of the trusts a provision that Lober could at any time he saw fit turn over all (or any part) of the principal to the beneficiaries. Thus, he could at any time terminate the trusteeship over the principal. Since a "power to terminate" had already been held to be equivalent of a power to "alter, amend or revoke," the trusts were inevitably included in the gross estate.

As the majority opinion there indicated,

"A donor who keeps so strong a hold over the actual and immediate enjoyment of what he puts beyond his own power to retake has not divested himself of that degree of control which § 811(d)(2) requires in order to avoid the tax." 346 U.S. at 337, 74 S.Ct. at 100.

[NOTE that § 2038 now expressly includes the power to "terminate"]

*O'Malley* was also a case in which decedent was a settlor/trustee. There, the irrevocable trusts reserved to the trustees the power not only to accumulate income but to thereby add it to the principal. Since this enabled the decedent "to distribute that income to the income beneficiaries or to accumulate it and hold it for the remaindermen of the trusts" (383 U.S. at 632, 86 S.Ct. 1123, at 1126), it was clearly a retention of "the right to designate the persons who shall possess and enjoy the property or the income therefrom", and thus squarely within § 811(c)(1)(B)(ii).

Both the District Court and the Court of Appeals had ruled that the *principal* the settlor/trustee had transferred was includible in his gross estate, and that holding was not challenged in the Supreme Court. The only issue there was whether *income* of the trusts, accumulated and made part of the principal had been "transferred" by the decedent. The lower courts had ruled not; the Su-

preme Court viewed the conversion of income into principal as a "transfer" because each income increment added to principal itself became a source of further income, over which he retained the same right to designate whether the income beneficiaries or the remaindermen should receive it.

Thus, not only did *Lober* and *O'Malley* fall within the explicit language of what are now secs. 2036 and 2038, but the facts of those cases dealt with (a) a power to terminate and (b) a power to shift benefits from one *cestui* to another.

These fact situations are directly referable to explicit provisions of the regulations for life insurance, Reg. 20.-2042–1(c). The power to "terminate" under sec. 2038 is parallel to the power "to surrender or cancel the policy." The power to shift benefits under sec. 2036 is parallel to the power "to change the beneficiary".

Parallel fact situations in life insurance would lead to the same results as in *Lober* and *O'Malley* on the basis of the explicit language of the regulations, which parrot the committee reports. Neither decision reaches beyond the explicit parallel language, and the final result in *Lumpkin* is an erroneous extension of *Lober* and *O'Malley,* to fact situations that neither one deals with, and controlled by different statutory language.

In *Lumpkin* and here, the decedent could not elect to have benefits paid in a lump sum—there is no parallel to a "termination" like that in *Lober*. In *Lumpkin* and here, the decedent could not shift benefits from one to another beneficiary—there is no parallel to "the right to designate" those who shall enjoy the property, as in *O'Malley*.

In sum, the "rough analogy" seen by the *Lumpkin* court is no analogy at all.

Nor is "somewhat of an anomaly" a proper guide for judicial interpretation of the federal tax laws. If the federal tax laws have any single feature to char-

acterize them, it is that countless provisions are anomalous. The provisions of the tax laws are inherently political in both motivation and execution, and so they are necessarily irrational and anomalous. A few examples will suffice.

At one time, many States were considering and enacting community property laws. This was because the tax laws, which are applied nationwide, carried significant reduction of burden on married taxpayers in community property States. Faced with the inevitable, the Commissioner developed and secured enactment of the present law allowing the filing of a joint return by married taxpayers.

But the anomalies remain. If A and B are not married, their separate returns may claim a deduction of $150. for hospital and medical insurance premiums (for a total of $300), and up to $1,000 for long-term capital losses (for a total of $2,000). But if they marry, then the first deduction is cut down to $150 for both, and the second to $1,000 for both. This is an obvious anomaly, yet it is expressly written into the Code. Should A and B merely live together, without benefit of clergy? See, for example, "The New Morality and the Internal Revenue Code", 98 NJLJ 452.

There is a vast difference between the creation of a trust that may be exposed to § 2036 or 2038, and employer-provided survivor benefits such as those involved here and in *Lumpkin*. In the trust situation, the settlor owns assets which would be part of his estate if he dies. By creating the trust he takes the trust assets out of his gross estate (or tries to) and thereby reduces the estate tax. But in *Lumpkin* and here, the employee never had any assets equivalent to the benefits. Someone else provides them at his sole expense. Their existence in no way transfers assets out of the employee's estate, and they do not reduce his estate tax.

A further obvious anomaly exists under the new sec. 2039 itself. If an employer provides survivor benefits under

a "qualified plan", they are not included in the decedent's gross estate even though they are payments made as insurance under a policy on decedent's life.

This is because the exclusion of sec. 2039(c) is to apply "notwithstanding the provisions of this section or *of any provision of law* . . ." (Emphasis added). And see Reg. 20.2039–2(b), Example (3), for an instance where a lump sum received as proceeds of life insurance are treated as excluded because receivable under a qualified pension plan, even though the employee can designate the beneficiary.

In enacting sec. 2039 in the 1954 Code, Congress saw fit to exclude payments received as insurance on the life of the decedent. When it did so, it may well have intended that such payments, which are in the nature of annuities, be excluded from the gross estate without regard to sec. 2042. But as this point was not briefed by either side, no further exploration of it will be made.

In any event, if anything is obvious, it is that the insurance benefits paid here are closely analogous, if not economically identical, to survivors' annuities now covered by sec. 2039, rather than to decedent/settlor trustee transactions of the kind dealt with by sec. 2036, sec. 2038, and by *Lober* and *O'Malley*.

So, if analogies are to be drawn, they should be drawn to employer plans for the benefit of survivors of employees and retirees.

Sec. 2039 itself is anomalous in requiring inclusion of benefits under nonqualified plans and in excluding those under qualified plans. There can be no rational resolution of this outright anomaly because the Congress has so decreed. The anomaly may exist due to the influence of labor organizations which had negotiated contracts for qualified plans and did not wish to see their members' families suffer an erosion of the benefits through inclusion in the gross estate. If so, it is a rational explanation of the anomaly, but it fails to resolve it.

Having found a close, if not identical analogy, it remains to be seen whether there is any anomaly at all under the facts of *Lumpkin* or here.

Under the Tax Court disposition, there was no anomaly. Congress had carved out survivor benefits payable as insurance on the life of the employee from sec. 2039. Under *Billings* and under the Tax Court disposition in *Lumpkin,* these benefits were not included in the gross estate, just as annuities or life insurance under a qualified plan are not.

But the Court of Appeals, in *Lumpkin* created an anomaly in regard to survivor benefits under employer plans by first drawing a false analogy to a wholly unrelated subject. Once the false analogy is unmasked, no anomaly exists under *Billings* or under the Tax Court disposition of *Lumpkin.*

If one were to try to classify a leopard by comparing it to other animals on the basis of analogy and anomaly, a careless classifier might say that a leopard is analogous to a lion; both are felines, though the leopard has spots where the lion has none. But there are also tigers, which are feline and have stripes. Is the leopard more analogous to the lion or to the tiger?

The drawing of analogies and the detection of anomalies requires comparison of the class under consideration with more than one other class of the same genus. The comparison must be made in the light of the entire array, the whole spectrum of classes. In the present case, the employer's arrangement for family benefits is much closer to arrangements not calling for inclusion in the gross estate than it is to the individual trust relation, which is probably an entirely different genus.

A word must be said about *Billings,* the acquiescence in it to its withdrawal pending the appeal in *Lumpkin.* It has been ruled, in *Dixon v. U. S.,* 381 U.S. 68, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965) that the Commissioner is allowed to modify, amend or revoke an acquiescence, and to make these changes retro-

active for all taxpayers. He may also make the revocation selective as to classes of taxpayers.

This court is bound by *Dixon,* but this plenary power is worthy of deeper exploration and reexamination by a court having the authority to do so.

This power is a prime example of one of the most offensive forms that any system of law can devise, especially when the Commissioner can do so pending appeal in litigated cases.

The entire federal tax system in this country is based on self-assessment. Taxpayers are expected to know the law, or at least to ask someone who can look it up, and to tax himself honestly under that law. How can that goal be achieved when the Commissioner can withdraw an acquiescence 36 years later? How can the public in general, and the taxpayer in particular, be expected to respect the law when the government itself, through the Commissioner, can change the rules nearly 4 decades after the game is over?

■ Yet, the Commissioner's action in withdrawing its acquiescence to *Billings* does him no good. In the first place, the withdrawal was not expressed to be retroactive; hence it must be taken, like Acts of Congress, to be prospective only. It does not affect this case which is governed by the situation at decedent's death in 1964.

Second, the withdrawal can do no more, even if retroactive, than to cancel the 1937 acquiescence. *Billings* thus stands on its own feet. *Billings* is sound and will be followed here. *Lumpkin* is not sound and will not be followed here.

The provision in the policy by which some other settlement option could be worked out by agreement between Connelly, his employer and the insurer, is insignificant and not substantial. As noted above, it is worth no more than a tinker's dam.

■ This court construes that provision as reflecting no more than would be the case if the provision were not there. Every agreement, no matter how firmly drawn, may always be modified by another agreement. Even a formal agreement which expressly states that it cannot be modified except in writing, is subject to modification by oral agreement since the requirement for a writing is itself subject to modification. *Headley v. Cavileer,* 82 N.J.L. 635, 82 A. 908 (E&A1911).

Beyond that, the sense of the provision clearly limited its scope to the other patterns of the plan and policy. It is construed not to allow a change of beneficiaries, or a shift in benefits from one beneficiary to another. Everything in the plan and policy as a whole points to a meaning that restricts its operation to some other arrangement that is an economic and actuarial equivalent, such as making the widow's payments in full until she began drawing social security, and then making the reductions; or vice-versa; or providing that the interest on the amount retained be paid to her annually instead of accrued and compounded, and so on.

This provision gave Connelly no "right" or "power" that he could "exercise", either alone or in conjunction with others. It was not a "blank check", as argued by the government. It was not substantial. It was not an incident of ownership.

■ Lastly, Connelly argues that the existence of this provision was not known to decedent. This is an element, meritorious though it may be in real life, that can have no legal significance here.

*Lumpkin* has since been followed, adhered to and applied to a trust transaction in *Rose v. U. S.,* 511 F.2d 259 (CA 5, 1975). That later ruling displays further the weakness of *Lumpkin.* In *Rose,* the decedent was trustee under a trust established by another. He used trust

assets to purchase life insurance for the trust, and the trust not only possessed all the incidents of ownership but owned the policy as well. *Rose* required inclusion of the policy in the deceased trustee's estate even though it was plain that neither he nor his estate could derive economic benefit from the "incidents of ownership" which belonged to the trust. *Rose* therefore goes far beyond *Lober* and *O'Malley* and would require inclusion of life insurance in the trustee's gross estate when real estate or stocks and bonds could not be under any theory today.

If *Rose* were to stand, no individual could safely serve as trustee of a trust. His trust powers would create the risk that on his death, the value of someone else's trust would be part of his own gross estate. Only banks and trust companies could afford to be trustees for their existence is perpetual, they do not die, and they have no gross estate to be taxed.

*Rose* carries this risk because it creates a new anomaly by including trust life insurance, but not other kinds of trust property, in the deceased trustee's gross estate. Using the "rough analogy" and "somewhat of an anomaly" approach, the next step will be to include other kinds of trust property in the deceased trustee's estate.

And if corporate trustees be used, the next step will be to say that a deceased member of the trust committee, or of the board of directors, should include trust assets in his gross estate because corporations act only through individuals, and he possessed the powers "in conjunction with others."

The error of *Rose* confirms the error of *Lumpkin*. It confirms that when Congress enacted sec. 404 of the Revenue Act of 1942, it "sanctified the judicial gloss" of the preexisting case law, as pointed out in *Rhode Island Hospital*, 355 F.2d at p. 10. That judicial gloss included *Billings*.

The Congress had to know of *Billings* because the committee reports, in giving illustrations of incidents of ownership, listed every type of provision long set forth in life insurance policies except two: options as to the treatment of dividends (which are not "dividends" but adjustments of premiums to reflect the effect of actual experience measured against actuarial assumptions), and settlement options. These two provisions are so common and so well known, and *Billings* had already ruled out settlement options, that their omission from the list could only have been knowing, voluntary, intelligent and deliberate.

Both *Lumpkin* and *Rose* focus on the word "incidents", as though it referred to something casual or trivial, and overlook the key word "ownership", which implies economic benefit to decedent or his estate.

*Conclusion*

■ Taxpayer's motion for summary judgment is granted. The opposing motion is denied. Counsel are to submit a form of final judgment, along with interest calculations, noting the change of rate from 6% to 9% effective July 1, 1975.

Counsel are also directed to submit, on or before September 15, 1975, statements under oath explaining how the erroneous stipulation of facts came to be erroneous, so that the court may consider whether any disciplinary action should be initiated.

So ordered.