# In the
# United States Court of Appeals
## for the Fifth Circuit

m 01-41269

DOOR CONTROL SERVICES, INC.,

Plaintiff-Counter-Defendant-Appellee-
Cross-Appellant,

VERSUS

BESAM AUTOMATED ENTRANCE SYSTEMS, INC.,

Defendant-Third-Party Plaintiff-Counter
Claimant-Appellant-Cross-Appellee.

Appeal from the United States District Court
for the Eastern District of Texas
m 6:00-CV-293

February 5, 2003

Before JONES, SMITH, and SILER,[*]
Circuit Judges.[**]

JERRY E. SMITH, Circuit Judge:

Besam Automated Entrance Systems, Inc. ("Besam"), appeals a jury award of $6,000,000 to Door Control Services, Inc. (Door Control"), for fraud. Door Control cross-appeals a judgment as a matter of law ("j.m.l.") on its claims of breach of contract, breach of duty of good faith and fair dealing, and tortious interference with contractual relations. We affirm in part, reverse in part, and remand for further proceedings.

## I.
### A.

Besam manufactures a line of commercial automatic doors that are sold and serviced by independent distributors. From 1983 to 2000, Door Control was Besam's distributor for the north/east/central Texas region, which included the Dallas and Fort Worth markets. After 1986, their legal relationship was controlled by a written agreement (the "Distributorship Agreement"); Door Control claims the agreement has been orally modified over the years.

In 1999, the Houston area distributor of Besam doors faced serious financial difficulties and could not meet installation deadlines for several large clients; Door Control helped Besam meet those installation deadlines and claims that, in return, Besam orally agreed to grant it a distributorship for the Houston and San Antonio areas. Door Control took out a loan to finance its expansion into those markets.

In February or March 2000, Besam informed Door Control that it would directly distribute and service its doors in the Houston area. Besam later asked Door Control to stop servicing clients in the area, but Door Control refused. Besam then terminated Door Control's north/east/central Texas distributorship. Lacking a major door line to sell, Door Control suffered a decline in business.

### B.

Door Control sued Besam in Texas state court alleging, *inter alia*, breach of contract, breach of the duty of good faith and fair dealing, fraud, and tortious interference. Besam removed the case to federal court based on diversity jurisdiction and asserted counterclaims. The case proceeded to trial, and Besam moved for j.m.l. at the close of Door Control's presentation of evidence. The district court granted j.m.l. on all claims except fraud, on which the jury awarded $6,000,000 in lost profits and $400,000 in reliance damages.[1]

## II.

Besam contends it is entitled to j.m.l. with respect to lost profits because the record contains insufficient evidence to support the verdict, in light of the fact that Door Control's damages expert testified as to lost gross profits, rather than lost net profits as required under Texas law. Door Control argues that because the jury was properly instructed that it

[*] Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] Besam was awarded $360,711 on its counterclaim for Door Control's failure to pay money due under the Distributorship Agreement.

was to award net profits,[2] it was allowed to consider other evidence that supported the amount awarded.

## A.

We review *de novo* a ruling on a motion for j.m.l. "whether based upon an interpretation of Texas law or based upon the sufficiency of the evidence." *Info. Communication Corp. v. Unisys Corp.*, 181 F.3d 629, 633 (5th Cir. 1999). We review the record as a whole and draw all reasonable inferences in favor of the non- moving party. *Phillips v. Monroe County*, 311 F.3d 369, 373 (5th Cir. 2002). In an action tried to a jury, a motion for j.m.l. challenges the legal sufficiency of the evidence supporting the verdict. *Cozzo v. Tangipahoa Parish Council-President Gov't*, 279 F.3d 273, 280 (5th Cir. 2002). Thus, the "'standard of review with respect to a jury verdict is especially deferential.'" *Id.* (quoting *Brown v. Bryan County, Okla.*, 219 F.3d 450, 456 (5th Cir. 2000)).

## B.

In Texas, the proper measure of damages for lost profits is lost *net* profits. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 n.1 (Tex. 1992). "[T]he injured party must do more than show that it suffered some lost profits." *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 504 (Tex. 2001). Recovery must be "predicated on one complete calculation," and "opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained." *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994).

---

[2] The district court defined net profits as "what remains in the conduct of a business after deducting from its total receipts all of the expenses incurred in carrying on the business."

The plaintiff is not required to calculate lost profits precisely; rather, "it is sufficient that there be data from which they may be ascertained with a reasonable degree of certainty and exactness." *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, at 279 (Tex. 1994) (quoting *Southwest Battery Corp. v. Owen*, 115 S.W.2d 1097, 1098 (Tex. 1938)). Still, this burden is onerous, and "Texas courts have not hesitated to direct verdicts where plaintiffs have failed to present evidence of lost profits meeting these standards." *Info. Communication Corp.*, 181 F.3d at 633.

## C.

Door Control contends that the jury properly used net profits as the measure of lost profits. It argues that the jury could have taken the damage expert's estimate of lost gross profits of between $8,619,070.94 and $15,-000,000 and reduced it to $6,000,000 by taking into account future expenses. Door Control reasons that these expenses were predictable, because financial statements from 1997 through the first quarter of 2001 were admitted into evidence, and Door Control's controller explained that the financial statements accurately represented Door Control's income and expenses.

In *Fury Imports, Inc. v. Shakespeare Co.*, 554 F.2d 1376, 1387 (5th Cir. 1977), which applied New York law, we considered the evidence supporting lost profits damages awarded to a distributor for the manufacturer's breach of contract. Evidence was presented showing the amount of lost gross profits caused by the manufacturer's breach and resulting lost retail sales. Though the plaintiff presented evidence that there were multiple categories of expenses that would have increased in different ways had the sales not been lost, there was no estimate of how each of these categories would

3

have varied with increased sales, nor even what the overall effect on expenses might have been. Instead, the jury was provided profit-and-loss statements from previous years. We concluded that these financial records did not provide the jury with sufficient evidence to calculate lost net profits, because the jury had no way of extrapolating, from the past actual expenses, a prediction for how future expenses would have increased. Absent proper guidance, there "was simply no evidence at all as to net, as distinguished from gross, profits." *Id.*

The reasoning of *Fury Imports* is persuasive here. Although Door Control provided the jury an estimate of lost gross profits, it gave no similar guidance as to how future expenses would have varied. We have thoroughly reviewed the financial records considered by Door Control's expert in estimating lost gross profits. With each financial statement, gross and net profits varied greatly and were not correlated in any way that is readily apparent.

For example, from 1999 to 2000, gross profits grew by about 30%, from $2,608,-986.52 to $3,381,366, yet net profits fell $120,786.30, a decrease of over 20% from the previous year. Similarly, the fourth quarter of 1999 represented both the best quarter of the year for gross profits and the worst quarter of the year for net profits. This historical data is insufficient to allow a jury to determine, with reasonable certainly, how expenses would have changed in future years.[3]

D.

Door Control contends that other evidence supports the award. Its controller, Ricky Northcutt, testified that, based on a year-end comparison of net profits from 1999 and 2000, Door Control experienced a decrease in net profits of $120,000. He also stated that in the first quarter of 2001, profits were down $483,-000 compared to the first quarter of 2000. Don Gilchrist, the owner of Door Control, testified that it would take five to ten years to return Door Control to the level of profitability it experienced when it was Besam's distributor for the north/east/central Texas region. Door Control contends that a jury could find that it suffered $6,000,000 of lost net profits based on the combined testimony of Northcutt and Gilchrist, by projecting the two quarters of reduced net profit testified to by Northcutt over the time period of injury testified to by Gilchrist.

The testimony of Northcutt and Gilchrist does not combine to form a calculation that demonstrates lost net profits with the reasonable certainty necessary to support an award of damages. Evidence to establish profits must not be uncertain or speculative. *Tex. Instruments*, 877 S.W.2d at 279. Northcutt testified only that profits were lower than in the previous year; he did not state how large those pro-

_____

[3](...continued)
the lost gross profits were likely to have remained as net profits after expenses, it could have employed the Door Control expert's projected lost gross profits and awarded between $1,500,000 and $2,500,000. The best year on record yielded net profits that were 22% of gross profits, which, if extrapolated, would lead to an estimate of lost net profits of between $1,900,000 and $3,000,000. The award of $6,000,000 is 40% to 70% of the range of projected lost gross profits, a percentage nowhere suggested by the financial records.

_____

[3] Even were we to find that these past expenses were competent evidence to predict future expenses, the records contain no information that even arguably could support a verdict of $6,000,000. From 1998 through 2000, net profits were 17% of gross profits. Had the jury determined that 17% of

fits would have been absent Besam's fraud, nor did he even assert that this drop was attributable to Besam's conduct. He also provided no evidence that could be used as the basis for a projection of future net profits beyond the two quarters named.

Gilchrist offered no support, based on objective facts or data, for his assertion that it would take five to ten years for Door Control to regain profitability.[4] Gilchrist's speculative testimony is not competent evidence to support an award of lost profits. *See Szczepanik*, 883 S.W.2d at 650. On this record, there is no evidence of lost profits damages, so the denial of Besam's motion for j.m.l. is reversed.[5]

### III.

Door Control contends that the district court erred in granting Besam's motion for j.m.l. on the breach of contract claim, because Door Control presented sufficient evidence to allow a reasonable jury to find that Besam's termination of Door Control's north/east/central Texas distributorship breached the Distributorship Agreement. Door Control argues that the agreement had been orally modified and that Besam breached the agreement as modified. Besam avers that the Uniform Commercial Code's statute of frauds, N.J. STAT. ANN. § 12A:2-201, applies to the agreement, requiring that any modifications had to be in writing.

The Distribution Agreement contains a clause that prohibits modification of the contract except by a written agreement by a duly authorized Besam representative. If the New Jersey common law for contracts applies,[6] the Distribution Agreement could have been modified orally, notwithstanding this provision; New Jersey law allows every agreement, no matter how firmly drawn, to be modified by another agreement.[7] The Uniform Commercial Code covers all contracts for the sale of goods sold for $500 or more. N.J. STAT. ANN. § 12A:2-201(1). Had the UCC applied to the contract, its statute of frauds would have required that all modifications be in writing. *See* § 12A:2-209; 5-80 N.J. TRANSACTION GUIDE § 80.34.

"[B]ecause of the mixed character of many distributorships, the UCC's statute of frauds may or may not apply in a given case." *Custom Communications Eng'g, Inc. v. E.F. Johnson Co.*, 636 A.2d 80, 85 (N.J. Super. Ct. App. Div. 1993). *Custom Communications* distinguishes between contracts involving a transaction of goods plus incidental services, which are covered by the UCC, and contracts for services plus the incidental sale of goods, which are covered by customary contract law. *Id*. at 83. The court in *Custom Communications* found the law of other jurisdictions per-

---

[4] To provide context to the remarks, we note that Gilchrist next declared that it would also take "take thousands of sales calls to get people to understand the new line" and "probably five to ten million dollars." His testimony was based on conjecture, not reasoned analysis supported by facts.

[5] Besam challenges the award of lost profits on several other grounds. Because the evidence is insufficient to support lost profit damages, we need not address those arguments.

[6] The distributorship agreement provides that New Jersey law controls the performance and construction of the contract.

[7] *Estate of Connelly v. United States*, 398 F. Supp. 815, 827 (D.N.J. 1975) ("Even a formal agreement which expressly states that it cannot be modified except in writing, is subject to modification by oral agreement since the requirement for a writing is itself subject to modification.").

suasive, stating:

> The common theme expressed in nearly all of the cases is that, although most dealership or distributorship agreements involve more than a mere sale of goods, the sales aspect of the relationship predominates. Accordingly, courts have not hesitated to conclude that a direct dealership agreement, as here, is subject to the . . . UCC. We adopt the majority rule as sound, since it is entirely consistent with the underlying purposes of the UCC: to foster consistency and predictability in the commercial marketplace.

*Id.* at 84. *See also Spring Motors Distribs., Inc. v. Ford Motor Co.*, 489 A.2d 660, 668 (N.J. 1985) ("[T]he U.C.C. is the more appropriate vehicle for resolving commercial disputes arising out of business transactions between persons in a distributive chain.").

New Jersey law adopts a strong presumption that the UCC applies to distribution agreements. The Distribution Agreement is sufficiently similar to those found in the many cases cited by the *Custom Communications* court to apply the UCC statute of frauds to its enforcement. *Custom Communications*, 636 A.2d at 84 (citing cases). Oral modifications therefore were not allowed. The agreement provided that it could be terminated for any reason on thirty days' notice. Besam exercised its rights in accordance with this provision when it terminated Door Control's distributorship, so the district court properly granted j.m.l. in this regard.

### IV.
Door Control appeals the j.m.l. with regard to its claim for breach of duty of good faith and fair dealing. It argues that it presented sufficient evidence for a jury to find that Besam intended to deprive Door Control of its distributorship before the time of termination and that it withheld this information from Door Control in violation of the implied covenant of good faith and fair dealing found in the contract under New Jersey law. Besam answers that Door Control has waived the right to argue that New Jersey law applies, and Besam contends that, under Texas law, the duty of good faith and fair dealing does not extend to ordinary contractual relationships.

### A.
Besam asserts that Door Control waived its argument under New Jersey law because it did not specifically raise New Jersey law in its oral response to Besam's motion for j.m.l. The record demonstrates that the district court was sufficiently aware of the grounds for Door Control's objections to Besam's motion for j.m.l., including its position under New Jersey law.

> Formal exceptions to rulings or orders of the court are unnecessary; but for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which the party desires the court to take or the party's objection to the action of the court and the grounds therefor; and, if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice the party.

FED. R. CIV. P. 46. "The purpose of the rule is that the district court should be given notice of an alleged defect so the court has an opportunity to cure it." *Hartford Lloyd's Ins. Co. v*

6

*Teachworth*, 898 F.2d 1058, 1060 (5th Cir. 1990).

> Normally, "that purpose can be adequately served only by the making of an objection on the record, but if the court and the other litigants know what action a party desires the court to take, the purpose of the rule is served." Stone v. Morris, 546 F.2d 730, 736 (7th Cir. 1976). In such circumstances, a formal objection is not required, "and the failure of the court to take the desired action may be asserted as error on appeal."

*Id.* at 1060-61*; see also* 9 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2472, at 92-105 (2d ed. 1995).

Door Control made a pretrial motion that was never ruled on, asking the court to recognize the applicability of New Jersey law to all contractual claims. In the pretrial order, the applicability of New Jersey law to the claim for breach of good faith and fair dealing was listed specifically as a contested issue of law. The district court never ruled on the question.

It is apparent that neither side was expected to say much regarding the motions, because the court decided that it was unnecessary to listen to arguments with which it was already familiar.[8] As soon as both sides had finished, the court announced that it already had prepared its ruling, which it began reading. After listing all of Door Control's claims except the fraud claim, the court stated that it "finds that plaintiff has failed to present legally-sufficient evidence, regardless of whether Texas or new

---

[8] Moments after Besam's trial counsel, Mr. Burke, began making his motion for j.m.l., the court interrupted him:

> THE COURT: I don't want you to go into the testimony. Just make your motions, and I think it is broad enough the way you have already made it, unless you want to add to it.

(continued...)

[8](...continued)

> MR. BURKE: If I can maybe say one sentence about each one of the plaintiff's claims and limit it to that?

> THE COURT: I don't think that is going to be necessary.

Burke proceeded quickly to outline his motion, and at his conclusion, Mr. Travis, trial counsel for Door Control, began.

> MR. TRAVIS: May I respond, Your Honor?

> THE COURT: Briefly.

> MR. TRAVIS: Your Honor, I will endeavor–

> THE COURT: Your response has been what you have been putting on for four days.

> MR. BURKE: I was going to make your job easier and make a concessionSSI was going to make your job easier and concede on someSScertain claims. Would you like me to do that, or shall we keep all our claims?

> THE COURT: If you can be brief about it. I've heard the evidence for four days. I don't think it is necessary for you to repeat it to me.

At the court's instruction, counsel quickly listed which claims he was withdrawing and which ones he intended to pursue.

7

Jersey law controls, such that a reasonable Jury could find in its favor on these claims." Consequently, before the motion for j.m.l. was made, Door Control had sufficiently made known to the court its position on the applicability of New Jersey law to satisfy the requirements of rule 46.

## B.

The UCC, including its choice-of-law provision, applies to the Distributorship Agreement. *See Davidson Oil Country Supply Co. v. Klockner, Inc.*, 908 F.2d 1238, 1248 (5th Cir. 1990). The relevant provision is identical in the law of Texas and New Jersey; it provides that "when a transaction bears a reasonable relation to this State and also to another state or nation the parties may agree that the law either of this State or of such other state or nation shall govern their rights and duties." TEX.BUS. & COM.CODE ANN. § 1.105(a); N.J. STAT. § 12A:1-105(1).

This requirement is satisfied here with respect to Texas and New Jersey. New Jersey law therefore applies to the issue of breach of good faith and fair dealing, because the choice of law provision in the Distributorship Agreement provides that New Jersey law applies to the performance and construction of the agreement.

## C.

Under New Jersey law, every contract has an implied covenant of good faith and fair dealing. *Onderdonk v. Presbyterian Homes*, 425 A.2d 1057, 1062 (N.J. 1981). In *Bak-A-Lum Corp. of Am. v. Alcoa Bldg. Prods., Inc.*, 351 A.2d 349, 350-52 (N.J. 1976), the court held that a manufacturer breached its implied covenant of good faith and fair dealing when it failed to tell a distributor that it was planning to end the exclusivity of the distributor's territory, knowing that the distributor was in-vesting substantial sums of money to expand its operations within the territory.

Door Control presented evidence to support a claim under breach of good faith and fair dealing. It demonstrated that Besam attempted to purchase all or part of Door Control on more than one occasion, but, each time, Door Control refused the offer. There also was evidence that Besam attempted to hire several Door Control employees months before Besam terminated the distributorship. Evidence indicated that Besam may have contacted competitors of Door Control in attempts to purchase them, potentially in an effort to transfer the distributorship to the newly owned competitor.

Gilcrest also testified that he received a secret call from a Besam employee advising him to look for a second line of doors, because others at Besam were "planning on doing some things with our distributorship that he didn't think was right." Door Control presented sufficient evidence for a reasonable jury to find that Besam breached an implied covenant of good faith and fair dealing under New Jersey law, so the j.m.l. in this respect is reversible error.

## V.

Door Control argues that the district court erred in granting Besam's motion for j.m.l. on the tortious interference claim, because Door Control presented sufficient evidence for a jury to find that Besam tortiously interfered with employment contracts between Door Control and its employees. Besam argues that under Texas law, third-party interference in at-will employment is not tortious interference and that competitors are privileged to compete for employees' services.

8

### A.

Texas law adopts the view of the second *Restatement* that employment at will is treated analogously to prospective contracts with respect to tortious interference:[9] "[T]o establish liability for interference with a prospective contractual or business relation the plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful. By 'independently tortious' we mean conduct that would violate some other recognized tort duty.'" *Wal-Mart*, 52 S.W.3d at 713. This holding employs more limiting language than did the second *Restatement* or prior Texas law, though the court noted "that the case law is generally consistent with this position as a matter of outcomes as distinct from articulation." *Id*. at 721.

We read *Wal-Mart* to apply to at-will contracts. Because Door Control has neither proven nor alleged any independently tortious or unlawful conduct by Besam in its efforts to lure Door Control's employees, j.m.l. on the claim of tortious interference with respect to all at will employees was proper.[10]

### B.

One former Door Control employee, Patrick Lyness, was under an employment contract that contained a covenant not to compete when he left to work for Besam; therefore, interference with his employment must be analyzed separately. Evidence indicated that Besam contacted Lyness about potential employment before he quit his job and that he went to work for Besam two weeks after leaving Door Control.

Lyness's employment contract and covenant not to compete, if valid, may form the basis of a claim for interference with contractual relations. *Travel Masters, Inc. v. Star Tours, Inc.*, 827 S.W.2d 830, 833 (Tex. 1991).

---

[9] *See Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 689 (Tex. 1989) (citing RESTATEMENT (SECOND) OF TORTS § 766 comment g); *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 719 (Tex. 2001) ("The second *Restatement*, like the first, provided that lawful competition was not tortious interference with a prospective business relation although it might be tortious interference with any contract *not terminable at will*.") (emphasis added); *see also* RESTATEMENT (SECOND) OF TORTS § 766 comment g ("One's interest in a contract terminable at will is primarily an interest in future relations between the parties, and he has no legal assurance of them. For this reason, an interference with this interest is closely analogous to interference with prospective contractual relations.").

[10] Before *Wal-Mart* was decided, the view was that "Texas law supports a claim for interference with a terminable-at-will contract where a third-party has induced the contract's breach without any economic justification or goal other than evisceration of the underlying contract." *C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1249 n.11 (5th Cir. 1985). With an economic motive, and absent otherwise illegal conduct, however, the conduct is justified. *Id*. Door Control's claim fails under this standard, as well, because it has asserted that Besam's goal was economic in nature.

We further recognize that the Texas Supreme Court, in the context of tortious interference with employment at will, has held that legal justification or excuse is an affirmative defense on which the defendant has the burden of proof. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 690. We read that holding to be limited to the context therein described, where a third-party is alleged to have intervened to cause an employer to terminate an employee. *See id.* at 688. In any case, Besam has asserted legal justification, and it is uncontroverted that such justification existed.

9

Besam has not challenged the validity of this agreement, nor has it offered a defense.[11] The district court committed reversible error in granting j.m.l. on Door Control's claim of tortious interference with Lyness's employment contract.

The judgment is AFFIRMED in part, REVERSED in part, and REMANDED for further appropriate proceedings.

---

[11] Besam's arguments addressed only the law applicable to at-will employees. Though Besam asserts that it is a competitor, "[t]he fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will." RESTATEMENT (SECOND) OF TORTS § 768(2); *see also Wal-Mart*, 52 S.W.3d at 719 n.32 (quoting § 768).