UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 97-20826
_____


INFORMATION COMMUNICATION CORPORATION,

                    Plaintiff - Appellant - Cross-Appellee,

OUTLAND TECHNOLOGIES INCORPORATED,

                    Plaintiff - Appellee,

                         v.

UNISYS CORPORATION,

                    Defendant - Appellee - Cross-Appellant.


_____

No. 97-20827
_____


INFORMATION COMMUNICATION CORPORATION; ET AL,

                    Plaintiffs,

INFORMATION COMMUNICATION CORPORATION,

                    Plaintiff - Appellee,

                         v.

UNISYS CORPORATION,

                    Defendant,

                         v.

ABBOTT, SIMSES, ALBUM & KNISTER,

                    Movant - Appellant.

_____

Appeals from the United States District Court for the
Southern District of Texas
_____

July 15, 1999

Before KING, Chief Judge, and POLITZ and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

These two appeals arise from a cross-filed suit between Information Communication Corporation ("ICC") and Unisys Corporation ("Unisys") over a bilateral contract between the two companies. At trial, the jury found through a special verdict that both companies had materially breached the contract, that Unisys had breached first, and that Unisys's and ICC's respective damages from the breaches were $192,000 and $2.7 million. After the trial, but before the district court rendered judgment, Abbott, Simses, Album & Knister ("Abbott Simses"), which represented ICC during part of the case, sought to intervene to protect its right to recover its attorneys' fees from any award to ICC. As to the suit between the companies, the district court ruled that neither ICC nor Unisys was entitled to an award and entered a take-nothing judgment. The district court also denied Abbott Simses motion to intervene. All three parties appealed the district court's rulings which we now affirm as to the take-nothing judgment.

I. BACKGROUND

At the heart of this case is a contract that ICC and Unisys entered into in April 1988.  Titled the Software Development Subcontract (the "Master Contract"), it governed the relationship of ICC and Unisys as joint creators of public-safety computer systems that could be used by police departments in small-to-medium-size cities to facilitate 911 dispatch, to manage records, and to write reports.  ICC created and supplied the software applications, and Unisys supplied the computer hardware.  Both parties agree that the Master Contract, with addenda, should be construed as one agreement and that performance by each party was intended to be measured by performance to each of the eight cities that purchased on of the Unisys/ICC systems.  Both parties also agree that ICC's and Unisys's covenants under the Master Contract were mutually dependent, such that if either party materially breached the contract, the other was excused from performing its contractual obligations.

Each city that installed a Unisys/ICC system encountered various and significant start-up problems.  Although ICC's software had run on computers used to demonstrate the systems, it did not function on the hardware ultimately supplied by Unisys for installation.  The problems cost each of the companies greatly.  The substantial amount of time and money that ICC spent rewriting the software for use on the Unisys machines exacerbated the company's cash flow problems and forced ICC to close its

3

doors in January 1991.  Although Unisys was ultimately able to supply the cities with working systems after ICC closed, it paid more than $2 million to settle claims made by the cities under the terms of their contracts.

After ceasing its operations, ICC filed suit against Unisys, and Unisys counterclaimed.  Each asserted that the start-up problems had been caused by the other having breached the Master Contract.  During a nine-day trial in August 1996, the parties introduced twenty-two witnesses and volumes of exhibits to show whether ICC and Unisys had fulfilled their contractual obligations.  ICC contended that Unisys had supplied inadequate hardware with inadequate central processing units as well as insufficient memory and disk space.  ICC argued that its software had run adequately on earlier Unisys hardware and hardware from other manufacturers.  While admitting that its delivery of some software was late under the terms of the Master Contract, ICC attributed the delays to its need to rewrite its software to work on Unisys's inadequate machines.  Unisys, on the other hand, claimed that its hardware had functioned properly and that the problems had arisen due to ICC's software.  Unisys contended that ICC's software did not function as promised and that it was delivered late at numerous sites.  Unisys also contended that the inadequacies in its hardware, if any, were due to ICC having underestimated the technical requirements of its own software.

4

At the end of the trial, the jury was instructed to answer six questions.  In the answers to those questions, the jury found that both Unisys and ICC had failed, without excuse, to perform material obligations under the Master Contract; that Unisys had been the first to breach materially; that $2.7 million dollars would fairly compensate ICC for Unisys's breach; and that $192,000 would fairly compensate Unisys for ICC's breach.  After trial, ICC moved for judgment on the verdict and Unisys moved for a Rule 50 judgment n.o.v. or, in the alternative, a remittitur of ICC's damage award.

In April 1997, the district court produced a forty-five page memorandum and order granting Unisys's motion, and entered a take-nothing judgment for both parties.  The district court held that neither ICC nor Unisys could recover damages under the Master Contract because each had materially breached it.  The court ruled in the alternative that, as a matter of law, the evidence presented to the jury concerning ICC's damages was too speculative to support any recovery.  Finally, the court stated that even if ICC was permitted some recovery as a matter of law, the damages awarded by the jury exceeded the bounds of reasonably recovery, and that they should be reduced from $2.7 million to $132,280.

In the same memorandum and order, the district court ruled on several motions pending before it, including the Abbott Simses

5

motion to intervene. Abbott Simses represented ICC in its litigation against Unisys from March 1991 to October 1994. In October 1994, the attorney at Abbott Simses that had led the team representing ICC moved to a different firm, taking the ICC account with him. Having not received any payments for the legal services provided to ICC, Abbott Simses argued that it was entitled to intervene in order to recover by preference and priority out of the first monies received by ICC from the judgment. The district court denied Abbot Simses motion, ruling: "Given the Court's primary decision herein that ICC may not recover as a matter of law, these motions are moot. In any event, the Motion for Leave is denied. The matters in issue are not sufficiently related to the operative facts in this six year old case to justify joinder of the proposed new claims."

II. DISCUSSION

A. Take-Nothing Judgment

ICC argues on appeal that the district court erred both in interpreting Texas law as requiring a take-nothing judgment, and in concluding that ICC offered insufficient evidence at trial to support the jury's finding that it had $2.7 million in lost profits damages. Unisys does not contest the district court's take-nothing judgment. It does argue, however, that if ICC's award is reinstated, Unisys's award should also be reinstated to

setoff any recovery by ICC.  We review de novo the district court's judgment as a matter of law, whether based upon an interpretation of Texas law or based upon the sufficiency of the evidence*.  See, e.g., Cobb v. Natural Gas Pipeline Co.*, 897 F.2d 1307, 1309 (5th Cir. 1990) (reviewing conclusions of state law de novo)*; Conkling v. Turner*, 18 F.3d 1285, 1300-01 (5th Cir. 1994) (reviewing a judgment regarding the sufficiency of the evidence de novo).

The district court predicated its take-nothing judgment upon its understanding of the Texas canon of contract law stated in *Dobbins v. Redden*, 785 S.W.2d 377 (Tex. 1990), that "'a party to a contract who is himself in default cannot maintain a suit for its breach.'"  *Id.* at 378.  This rule, the district court found, applies without limitation to all mutually dependent contracts. Therefore, because the jury found that both ICC and Unisys had breached the Master Contract, and both parties agreed that the Master Contract was mutually dependent, the district court held that the *Dobbins* rule precluded any recovery by either party.

Upon reviewing the relevant Texas caselaw, we agree with the district court that the *Dobbins* rule prevents Unisys from recovering under the Master Contract.  We are unconvinced, however, that it precludes recovery by ICC.  Specifically, we are troubled by the decision of the Texas Supreme Court in *Mead v.*

7

*Johnson Group, Inc.*, 615 S.W.2d 685 (Tex. 1981).  There, the
court permitted Evadine Mead, a party to a business sales
contract, to recover under that contract despite the fact that
she was in breach at the time she sued under it.  Noting that the
other party's breach had occurred first, the court permitted Mead
to recover because "[a] party in default on a contract is not
relieved by a subsequent breach by the other party."  *Id.* at 689.
Applied here, that principal would permit ICC to recover under
the Master Contract because Unisys had breached it first.
Because we do not find *Mead* distinguishable from this case on the
grounds stated by the district court,[1] we are unable to agree
that the rule in *Dobbins* instead of the rule in *Mead* should
necessarily control here.

---

[1]The district court distinguished *Mead* from this case on the
basis of the contract in *Mead* involving independent covenants, as
opposed to dependent covenants.  Even if this argument is
persuasive analytically, it is not a reasonable interpretation of
the *Mead* decision.  First, if the Texas Supreme Court believed that
it was considering a contract with independent covenants, its
statement in *Mead* that a "[d]efault by one party excuses
performance by the other party," *Mead*, 615 S.W.2d at 689, would be
patently incorrect.  *See Hanks v. GAB Business Services, Inc.*, 644
S.W.2d 707, 708 (Tex. 1983) ("A prerequisite to the remedy of
excuse of performance is that covenants in a contract must be
mutually dependent promises.").  Second, the case cited in *Mead* as
supporting the principle that a party in default is not relieved by
the other party's subsequent breach, *Whittenburg v. Groves*, 208
S.W. 901 (Tex. Comm'n App. 1919, judgm't adopted), states the
principle in regards to a contract for the sale of real estate,
which clearly would have involved mutually dependent covenants.
Third, the court in *Mead* makes no mention of independent versus
dependent covenants nor otherwise indicates that the difference was
relevant.  *Mead* is thus not so easily dismissed in relation to this
case.

8

We nonetheless do agree with the district court that ICC should be denied recovery on the court's alternative ground, that ICC presented insufficient evidence to support the jury's finding lost profits.  In ruling on a Rule 50 motion based upon sufficiency of the evidence, we "consider all of the evidence-not just that evidence which supports the non-mover's case--but in the light and with all reasonable inferences most favorable to the party opposed to the motion."  *Boeing v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969).  The motion was properly granted "[i]f the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict."  *Id.*

The standard under Texas law for proving lost profits is onerous.  The amount of profits lost "must be shown by competent evidence with reasonable certainty."  *Texas Instruments, Inc. v. Teletron Energy Management, Inc.*, 877 S.W.2d 276, 279 (Tex. 1994).  Lost profits may not be recovered where they are "too uncertain or speculative, or where the enterprise is new or unestablished."  *Id.*  In determining whether the claimed lost profits are speculative, courts are to consider whether they are "dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a new and unproven enterprise."  *Id.*  Texas courts

9

have not hesitated to direct verdicts where plaintiffs have failed to present evidence of lost profits meeting these standards. In *Texas Instruments*, for example, the Supreme Court of Texas affirmed a trial court's decision to overturn a jury's award of $500,000 in lost profits damages because the damages were based on the plaintiffs plans to market an untested new product, a voice-prompted, programmable thermostat. There, the court remarked that "[t]he mere hope for success of an untried enterprise, even when that hope is realistic, is not enough for recovery of lost profits." *Id.* at 280. *See also Szczepanik v. First Southern Trust Co.*, 883 S.W.2d 648, 650 (Tex. 1994) (denying recovery of lost profits where the plaintiffs evidence of lost profits was deemed too speculative); *Holt v. Atherton*, 835 S.W.2d 80, 85-86 (Tex. 1992) (same).

We agree with the district court that ICC did not meet its burden of proffering competent evidence to show the existence of lost profit damages with reasonable certainty. ICC was a paradigmatic new and unproven business. Recently opened, it had no track record of successfully creating and marketing new products. It had been late with many of its software deliveries and the majority of its customers experienced significant start-up "bugs." Furthermore, ICC had essentially no history of

profitability.[2]  Because the computer software market is ever-changing and ICC did not have many, if any, future contracts in place when it shut down, ICC was not assured a profitable future. These factors were reflected in the Small Business Administration's refusal to guarantee a $300,000 loan to ICC in August 1990.  They also compel our conclusion that although ICC may have had a realistic *hope* that it would find much success in its future, that hope was not sufficiently concrete to permit recovery for lost profits.

B.    Denial of Motion to Intervene

Abbott Simses's only interest in this case was to recover its fees from any monies awarded to ICC.  Our conclusion, in

---

[2]ICC admits that its only arguably profitable year was fiscal year 1990 when it claims to have made a net profit of $107,048. Even that claim is suspect, however.  The only evidence of profitability proffered by ICC was a report compiled by Ernest Bugh, a CPA.  That report blindly relied upon income statements provided by ICC and did not include an audit or review of the underlying financial information.  That underlying financial information contained sufficient disparities to make all of Bugh's conclusions unreliable.  Most notably, the income statement provided by ICC indicated that ICC had a "Cost of Sales" of $161,314 for FY1990.  Yet, the "Cost of Project" amount on ICC's schedule of contracts for FY1990, which should have been included in the "Cost of Sales" figure, was over $360,000.  If the entire "Cost of Project" amount had been included in the "Cost of Sales," ICC would have shown a net loss, instead of a profit, in FY1990. Although Bugh hypothesized that this discrepancy was the result of an accounting irregularity instead of a computational error, that speculation was unsupported by evidence.  Furthermore, because Thomas Mayor, ICC's damages expert, relied upon Bugh's profit calculation in estimating damages, this irregularity makes ICC's damages evidence suspect, as well.

agreement with the district court, that ICC should receive no damage award nullifies this interest. Abbott Simses's appeal is therefore moot and consideration of its arguments on appeal unnecessary.

III. CONCLUSION

For the foregoing reasons, we affirm the district court's decision denying recovery to both Unisys and ICC for damages resulting from their respective breaches to the Master Contract. We do not consider Abbott Simses's appeal of the district court's denial of their motion for leave to intervene as the take-nothing judgment moots their interest in this case.

AFFIRMED.