United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 9, 2005**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 04-50367
_____

BCE EMERGIS CORPORATION,

Plaintiff-Appellant,

versus

COMMUNITY HEALTH SOLUTIONS OF AMERICA, INC.;
BENCOMP NATIONAL CORP; GARY S. SIMMONS; MICHAEL R. MASTERS;
BARBARA FREEMAN; RICHARD K. DANKWORTH; SCOTT BARNES;
CLARENDON NATIONAL INSURANCE COMPANY,

Defendants-Appellees.

Appeal from the United States District Court
for the Western District of Texas
1:02-CV-741-LY

Before JOLLY, JONES, and DEMOSS, Circuit Judges.

EDITH H. JONES, Circuit Judge:[*]

Plaintiff-Appellant BCE Emergis Corporation ("BCE")
appeals the jury verdict exonerating Defendant-Appellees Community
Health Solutions of America ("CHS"), numerous individuals
(collectively, "CHS," "Appellees"), and Clarendon National
Insurance Company ("Clarendon") from its claims for, inter alia,
breach of contract, breach of fiduciary duty, and misappropriation
of trade secrets. BCE challenges the district court's denial of
BCE's motion for judgment as a matter of law, its motion for new

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this
opinion should not be published and is not precedent except under the limited
circumstances set forth in 5TH CIR. R. 47.5.4.

trial, the content of the verdict forms and jury instructions, and various evidentiary rulings. Having reviewed the record, and finding no significant error in this carefully tried case, we affirm.

## I. BACKGROUND

BCE developed and maintains a nationwide network of healthcare providers, through which it offers access to discounted healthcare services. NHS, located in Louisville, Kentucky, is a wholly-owned subsidiary of BCE, which offers utilization review and case management services. NHS was incorporated in 1984 and became BCE's subsidiary in February 2000. NHS's four primary products include medical review, management, disease management, and a 24-hour nurse/triage help line. NHS employees four hundred people, eighty percent of whom are nurses. NHS uses numerous written policies and procedures, as well as a management software program called CareReview, in operating its business. NHS is accredited by the Utilization Review Accreditation Commission ("URAC"), and frequently shares its policies and procedures with other healthcare service providers. On contracts for government-sponsored insurance programs, such policies and procedures must satisfy certain requirements.

Appellee Clarendon National Insurance Co. ("Clarendon") hired NHS to provide medical management services for contracts Clarendon had with the states of Texas and Florida. In Texas,

Services were performed in Texas for the Texas Children's Health Insurance Program ("CHIP"), and in Florida for the Florida Healthy Kids Program ("Healthy Kids"). The CHIP contract was for an initial three-year term starting in May 2000, with two automatic one-year terms of renewal. The Healthy Kids contract was negotiated and acted upon, but never memorialized. The NHS executive staff based in Louisville and responsible for these subcontracts included Appellees Barbara Freeman ("Freeman"), President and Chief Medical Officer from the 1990's to July 2002; Richard Dankworth ("Dankworth"), Executive Vice President until June 2002; and Scott Barnes ("Barnes"), Vice President for Information Systems until March 2002. Barnes was responsible for the development and upkeep of the CareReview program. CHS was incorporated in February 2002 by its two principals, Appellees Michael Masters ("Masters") and Gary Simmons.

## A. BCE's Case to the Jury

The Parties continue to disagree as to what the evidence showed. Thus, we present the arguments of each side sequentially. Masters developed the concept of an "exclusive provider organization" ("EPO") model for the delivery of rural healthcare services. Under an EPO, one company would provide services in Texas and Florida; however, operating the EPO would require the operational capability of NHS, and CHS lacked this capacity at the relevant time. Thus, BCE alleged Appellees accomplished this goal

3

by pilfering NHS's proprietary information and employees.  In spring 2001, Masters developed an EPO proposal for Clarendon, which he also secretly sent to Freeman and Dankworth for advice even though the proposal did not concern business with NHS.  Then several "offline" discussions took place between Masters and both Freeman and Dankworth to determine whether each was interested in business opportunities with CHS.  By late 2001, Masters had enticed Dankworth with employment opportunities at his startup; Dankworth expressed interest for himself and on behalf of his fiancée Patty Callen ("Callen"),[1] the NHS manager who oversaw the nursing staff that directly served CHIP.

Further, in early 2002 Masters and Simmons met secretly with Dankworth and Barnes at a Louisville hotel to continue employment discussions.  Barnes brought along four of his computer department subordinates.  In February 2002, Dankworth wrote to Masters and Simmons, outlining proposed terms of employment for himself and Callen, including an ownership interest in the new company.  Simmons emailed Barnes's proposed offer letters for his four subordinates, requesting Barnes to review them.  Barnes and his subordinates left NHS for CHS in March 2002.

On March 19, 2002, Masters proposed to Clarendon's Senior Vice President Dominic Hagger that CHS become Clarendon's EPO for rural healthcare services.  Although this occurred months before

---

[1]     Dankworth and Callen are now married.

4

either Dankworth or Freeman quit NHS, both were identified as CHS executives in the organizational chart accompanying the proposal, and their resumes appeared on CHS letterhead.  The proposal described a medical management system that did not exist at CHS in March 2002 and included both CHIP and Healthy Kids.

Later, Hagger signed a separate proposal submitted by CHS for Florida Medicaid work, which, BCE claims, repeated the same misrepresentations about Freeman, Dankworth, and CHS's medical management capabilities.  BCE also contends this proposal appended confidential medical policies and procedures that Dankworth purloined from NHS and falsely claimed belonged to CHS.  According to BCE, Dankworth, the negotiator of the Texas CHIP contract with Clarendon, was familiar with BCE's confidentiality restrictions. BCE claims Dankworth asked a subordinate NHS employee, Patty Russell, to put the policies and procedures on a computer disk. Dankworth allegedly took the disk home and asked Callen to reformat the policies and procedures, such that references to NHS became references to CHS.  Dankworth then sent the reformatted policies to the then-CHS president, who passed them along to a CHS employee, who confirmed they were the policies included with the Florida Medicaid proposal.[1]  BCE alleges that the Hagger's and Dankworth's testimony shows these policies could only have come from the NHS policies used in the CHIP contract.

---

[1]     As will be discussed _infra_, Dankworth and Callen provided a very different account of these events at trial.

5

## B. Appellees' Case to the Jury

Appellees presented evidence that after BCE's acquisition of NHS, BCE instituted multiple dramatic changes in corporate practice at NHS. BCE transferred significant decisionmaking power out of Louisville, instituted rigid cost-cutting, and increased the bureaucracy of the workplace, as well as the workload. NHS required more approval to authorize expenditures by NHS personnel. Appellees testified that these changes ultimately affected client services. In particular, as NHS moved departments around, the IT department and all the computer hardware was moved from its base in Louisville to BCE's offices in Maryland and Canada. This proved a controversial issue, as many IT employees feared for their jobs. Barnes, in fact, approached NHS Vice President Christie Spencer and advised her that some of his subordinates were going to quit because of the deteriorating conditions. Around October or November 2001, the situation became more intense when NHS employees learned BCE had a non-compete agreement "in the works" that they would be required to sign. Upon learning this, Barnes and Dankworth began aggressively seeking other employment. In February 2002, BCE circulated an annual acknowledgment of BCE's ethics-related policies and made signing it a condition of employment; several employees objected to signing it.

Without signing the agreement, Dankworth submitted his written resignation to NHS on May 27, 2002. Prior to his

6

resignation, Dankworth had discussed his dealings with CHS only in passing with BCE general counsel Joseph Mott; he did not discuss the departure of any other BCE employees. Freeman informed NHS of her possible job offer in June 2002 and left for CHS soon thereafter. Barnes and several members of his department left in March 2002 and were hired by Appellee Bencorp National Corp. ("Bencorp"), a startup company, to develop claims payment software. Barnes, et al., developed Care Management, which BCE alleges is remarkably similar to CareReview. Callen left in June 2002 for CHS, and Russell did likewise in September 2002. Clarendon then notified NHS that it was moving its CHIP and Healthy Kids medical management work to CHS. Clarendon gave the one-hundred-eighty-day notice required by the CHIP contract; however, because BCE (through its agent, Dankworth) had never finalized the Healthy Kids contract, Clarendon said it only needed to provide thirty to sixty days' notice to terminate that deal.

Appellees' evidence presents a different picture of the Healthy Kids agreement. As background, Appellees contend the State of Florida had been running the program, but the program did not reach rural areas of Florida. In 1997, Masters created a non-HMO, alternative product to cover children in rural areas. Masters recruited Clarendon to be the program writer and underwriter. Other companies were subcontracted to provide various services, including medical management. Appellees contend Masters brought together all the necessary constituent parts for the program, then

7

Clarendon entered into a contract with Florida to underwrite the program, and Clarendon in turn entered into subcontracts with other companies that Masters recruited to perform the actual services. Masters, first through his company Community Health Systems of America, Inc. ("CHS-Systems") and then through CHS, remained as the program manager of Healthy Kids. Initially, one of the subcontracts (for medical management) was with IntraCorp, but NHS was eventually chosen as its replacement. In September 2000, Dankworth sent a draft contract to Clarendon. Although no Clarendon executive signed the contract, in January 2001, NHS started working as the medical management subcontractor for Healthy Kids. The contract was to expire in April 2003.

Appellees present a similar background for CHIP. Masters, while putting together the Florida plan in 1999 for CHS-Systems, was also working with Texas officials regarding a similar program in Texas. These discussions eventually led to Clarendon's being awarded the CHIP contract, with the three-year plus renewal and one-hundred-eighty-day notice terms discussed above. Clarendon subcontracted with NHS to perform medical management. Just as with Healthy Kids, CHS-Systems was the program manager for CHIP. Appellees contend CHIP was met with numerous concerns from the Texas Health and Human Services Commission (the "Commission"). In essence, the Commission demanded fewer sub-contractors, better communication, and better integration. Masters also met with then-President and CEO of Clarendon, Detlef Steiner,

8

who also criticized CHIP's structure.

Masters considered ways to address these concerns. He eventually discussed them with Simmons, an officer from Cadent Underwriters, Inc. ("Cadent"), the claims processor for Healthy Kids. Both conceived of a virtual company that would operate under one name and coordinate all subcontractors. They abandoned this idea, and instead decided that perhaps CHS-Systems and BCE (and thus NHS) could enter into a joint venture and create one entity to perform the government health insurance contracts. Between summer and fall 2001, Masters proposed this idea to the CEO of BCE, Faye Baggiano. Baggiano initially supported the concept, but she eventually decided in October 2001 that BCE would instead compete with CHS-Systems for CHIP contracts.

With that response from BCE (and thus NHS), Masters and Simmons approached another medical care company in south Florida regarding the formation or purchase of a joint venture; neither event occurred. In December 2001, Masters and Dankworth met over drinks at an airport bar while waiting for their flights following a meeting. Masters mentioned to Dankworth that he was either going to buy or start a medical management company. Masters indicated Dankworth was surprised at first but then appeared to express interest in being hired, along with other NHS personnel. Masters was delighted and immediately called Simmons. That same month, Barnes contacted Simmons, with whom he had worked before, to see whether Simmons had any job openings. Barnes told Simmons about

9

the possible phase-out of the IT department at NHS and that he and others were looking for work. Simmons and Masters discussed Barnes's situation and experience; they decided he would be a desirable hire, as would other NHS IT personnel.

Barnes continued telephonic discussions with Simmons into January 2002. Appellees admit the Louisville meeting took place; Simmons had told Barnes he would soon be in Louisville. Appellees also admit that Barnes discussed his potential arrangement with NHS with his subordinates over lunch at a Wendy's fast food restaurant.

Masters followed up with Dankworth in January 2002 and asked whether he and others from NHS were under employment contracts and might consider working for another company. Dankworth said he would consider it, due to the hostile environment at BCE. Masters told Dankworth he would be passing through Louisville. Masters left Freeman a message about his discussions with Dankworth and essentially offered her a job.

At the Louisville meeting, Masters and Simmons discussed with Dankworth and Barnes their plan for consolidating services into one entity, CHS. They also described Simmons's new software company, Bencorp, which would be writing medical management programs similar to CareReview. Simmons specifically told Barnes that if he and others came to work for Bencorp, they would be creating their programs from scratch and they should not even bring a paper clip belonging to NHS.

In February 2002, after discussing the possible job moves

10

with Callen, Dankworth faxed his and Callen's employment criteria to Masters and Simmons. Around this time, Dankworth told Freeman, NHS General Counsel Joseph Mott, and Russell that he was considering working for Masters. Dankworth claimed he had conflicting feelings about the possible move and agonized over it.

Freeman avoided Masters' calls because she felt uncomfortable talking to him while she worked for NHS; she advised both Baggiano and Mott that Masters had offered her a job.

That same month, Masters continued his discussions with Clarendon about streamlining the CHIP administrative processes. Also, Masters and Simmons started CHS. In March 2002, Masters submitted a proposal on behalf of CHS to Clarendon to serve as its general agent for EPO services.

Clarendon was already considering removing its business from NHS. Additionally, CHS received an invitation to bid on a Florida Medicaid contract, and CHS approached Clarendon for permission to put together a bid. Clarendon gave such permission; Clarendon would be the program's insurance company, while CHS would serve as administrator. CHS needed to provide some sample policies and procedures, so Joyce Dove (then-president of CHS) asked Dankworth for some samples of the Clarendon policies and procedures for CHIP; Dankworth asked Patty Russell to provide copies of certain NHS policies on a disk. None of the documents was marked as confidential or proprietary. Callen then reformatted the samples with no substantive changes, only name and logo changes.

Hagger signed the proposal, which was submitted in April 2002.

In June 2002 Clarendon, BCE, CHS, and Bencomp representatives met at Clarendon's New York offices to discuss Clarendon's decision not to renew NHS's subcontract and the transition from NHS to CHS. Masters offered to purchase the remainder of NHS's subcontract for $500,000 and to offer jobs to any NHS employee working on the CHIP contract. NHS refused the offer.

NHS complained that CHS launched its operations using software pilfered, and only slightly altered, from NHS; specifically, NHS claims the outgoing employees stole the CareReview program. At trial, Appellees insisted that Barnes and the others at CHS began working on a "bare-bones" medical management software program called Care Management. They developed the architecture of the database system from scratch, using flip charts and Post-It notes. They also relied on model guidelines from similar government programs and URAC documentation obtained from public Internet sites. They used a code-writing tool called Progress to create the software's source code. CareReview was not copied; although there are similarities, the programs are not functional equivalents. Around this time, Callen and then Dankworth resigned from NHS, although Dankworth stayed on for a while (at NHS's request), and helped procure a project for NHS. Freeman left shortly after Dankworth.

Clarendon informed NHS that effective April 30, 2003, the parties' medical management contract for CHIP would not be renewed.

The same day, Clarendon notified NHS that its services would no longer be needed for Healthy Kids. Clarendon informed NHS that it wanted to centralize the services under these programs, and it had agreed for CHS to do that. This centralization through CHS yielded Clarendon administrative savings in CHIP of $3.5 million annually. The start-up and other attendant costs, however, yielded no immediate profit for CHS. Additionally, most of the former NHS employees moving to CHS experienced a reduction in salary and benefits.

## C. Litigation Commences

On November 19, 2002, BCE filed a six-count complaint asserting claims for, inter alia, tortious interference with contractual relations, tortious interference with prospective business relations, civil conspiracy, misappropriation of trade secrets, breach of fiduciary duty, and commercial disparagement, against all Appellees except Clarendon, seeking injunctive relief and damages. BCE also filed for and was granted a temporary restraining order ("TRO"), extended through January 6, 2003. An agreed order for expedited discovery was entered. BCE later amended its complaint to add Clarendon as a defendant, alleging misappropriation of trade secrets and commercial disparagement.[2] The district court denied all motions for summary judgment. Trial began on February 9 and continued through February 23, 2004. The

---

[2] BCE later dropped the commercial disparagement claims.

13

court entered judgment on the jury's verdict in favor of Appellees on February 24, 2004.  BCE moved for judgment as a matter of law or for a new trial, which motion the court denied on March 18, 2004.  BCE timely appealed.

## II.  DISCUSSION

### A.  Denial of BCE's Motions For Judgment As a Matter of Law and For New Trial

This court reviews a denial of a motion for judgment as a matter of law ("j.m.l.") de novo.  Arguello v. Conoco, Inc., 330 F.3d 355, 357 (5th Cir. 2003).  "[A] motion for j.m.l. in a jury case is a challenge to the sufficiency of the evidence supporting the verdict."  Id.  A Rule 50 motion is properly granted where the facts and inferences involved point so overwhelmingly and strongly in favor of one party that the court believes reasonable persons could not arrive at the opposite verdict.  Info. Communication Corp. v. Unisys Corp., 181 F.3d 629, 633 (5th Cir. 1999).  We consider all evidence in the light most favorable to the nonmovant, drawing all reasonable inferences therein in favor of that party.  Id.  To defeat a motion for j.m.l., the nonmovant must point to a conflict in substantial evidence.  Casarez v. Burlington N./Sante Fe Co., 193 F.3d 334, 336 (5th Cir. 1999).  "Substantial evidence is evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions."  Id. (internal quotation marks and citation omitted).

14

We review the denial of a motion for new trial for abuse of discretion. <u>Rivera v. Union Pacific R. Co.</u>, 378 F.3d 502, 506 (5th Cir. 2004). The "denial will be affirmed unless there is a clear showing of an absolute absence of evidence to support the jury's verdict." <u>Id.</u> (partially quoting <u>Lane v. R.A. Sims</u>, 241 F.3d 439, 444 (5th Cir.2001)).

BCE argues that the district court should have granted its motions (for j.m.l. and new trial) based on the overwhelming evidence that Dankworth, Freeman, and Barnes breached their fiduciary duties to BCE through their conduct in establishing and passing information to BCE's eventual competitor, CHS. Additionally, BCE contends it was entitled to j.m.l. on its claim against Dankworth for pilfering BCE proprietary information, and against Masters, Simmons, CHS, and Clarendon for aiding and abetting these fiduciary violations. Additionally, BCE claims the district court should have awarded it j.m.l., or ordered a new trial, on its breach of contract claim against Clarendon for Clarendon's violation of BCE's non-disclosure policies in turning over proprietary information.

As Kentucky law controls the breach of fiduciary duty claims, we first consider that state's fiduciary duty requirements. An employee-fiduciary must be loyal and faithful to the interests of the employer-principal. <u>DSG Corp. v. Anderson</u>, 754 F.2d 678, 682 (6th Cir. 1985). This duty "includes the obligation not to act against the employer's interests, not to establish a competing

15

enterprise until after the employment relationship is terminated, and, finally, requires the employee-fiduciary to disclose to the employer any information which could damage the company." Id. (citations omitted). An individual "cannot, while still a corporate fiduciary, set up a competitive enterprise, or resign and take with him the key personnel of the corporation for the purpose of operating his own competitive enterprise." Aero Drapery of Kentucky, Inc. v. Engdahl, 507 S.W.2d 166, 169 (Ky. Ct. App. 1974). Additionally, "an employee may not speculate for his gain in the subject matter of his employment by using information acquired in the course of employment against his employer's interests." DSG Corp., 754 F.2d at 682 (internal citations and quotations omitted). Kentucky fiduciaries further have a duty to disclose any information that could be harmful to the corporation. Id. Additionally, Kentucky law holds aiders and abetters of fiduciary violators of their corporate duties jointly and severally liable for any profits that accrue from such a breach. Steelvest, 807 S.W.2d at 485; DSG Corp., 754 F.2d at 683 n.7.

We evaluate this law in light of the jury's verdict, and review the record to determine, first, whether the verdict against BCE on each of these claims was in the face of overwhelming evidence to the contrary (the j.m.l. standard, which we review de novo); and second, whether BCE can demonstrate the district court abused its discretion in rejecting its motion for a new trial. BCE argues it produced undisputed evidence at trial that Dankworth,

16

Freeman, and Barnes each owed NHS a fiduciary duty. They breached such duty first by engaging for months in undisclosed negotiations with Masters and Simmons, who sought to create a competitor to NHS. BCE points to the covert discussions and the Louisville hotel meeting; Appellees had knowledge of the competitive consequences of the formation of CHS and their leaving NHS to work for CHS. BCE argues the proposals submitted by CHS to Clarendon falsely represented that Dankworth and Freeman, and also Callen and Russell, were, long before they resigned, already executives with CHS. Dankworth did not inform NHS officials of his plan to depart until he resigned; Freeman only did a year after the offline discussions had commenced.

In addition, BCE alleges Appellees breached their fiduciary duty by recruiting subordinates in the "secret exodus" to CHS. Barnes involved four of his subordinates in the scheme, meeting with them at a restaurant. Barnes also assisted in setting up the Louisville meeting and reviewed Simmons's offer letters to Barnes's subordinates. Dankworth, the conduit between Masters, Simmons, and Callen, also discussed Freeman's interest in CHS employment with Masters, and held meetings at his house to discuss CHS employment with Callen, Freeman, and Russell. Appellees also breached their fiduciary duty to NHS by not disclosing the conspiratorial conduct of one another. Instead, they actively facilitated it. BCE contends Masters and Simmons aided and abetted these fiduciary violations. Finally, BCE maintains Dankworth

17

breached his fiduciary duty by failing to finalize the Healthy Kids contract with Clarendon for NHS and not notifying Freeman. BCE also alleges Dankworth breached his fiduciary duty by removing policies and procedures from NHS offices, having a subordinate reformat them, and sending them to CHS for use in their proposals.

Viewing the evidence and drawing all inferences in favor of Appellees, as we must, we determine the district court correctly denied BCE's motion for j.m.l., and later its motion for a new trial, on BCE's breach of fiduciary duty claims. Simply put, Appellees put forward explanations and counter-stories to every factual assertion made by NHS; the jury credited Appellees' accounts of the disputed issues, and we cannot inject our own credibility determinations and factual opinions into the case on appeal. Specifically, Appellees testified that any discussions they had concerning employment with Masters and Simmons were appropriate and lawful. Appellees characterized the discussions with NHS as traditional job interviews, not an attempt to set up a competing organization. The allegedly conspiratorial employees all testified that they had become unhappy with the corporate changes instituted by BCE, particularly with being forced to sign what was essentially a non-compete agreement. The new job opportunity offered a way out of this unhappy situation without any resort to breach of fiduciary duty.

As to the termination of NHS's subcontract with Clarendon, evidence demonstrated that this loss was due to Texas's

18

and Clarendon's desire to streamline the provision of services. In fact, Appellees presented evidence at trial that Dankworth and Freeman helped NHS retain other existing contracts and obtain new ones, and Dankworth did so even after he had announced his decision to leave BCE.[3]

Appellees also disavowed any effort to coordinate an exodus from NHS, while BCE produced no evidence that Freeman engaged in any pre-arranged exodus plan. Barnes explained away the infamous "Wendy's meeting" as a happenstance conversation with his co-workers; the topic of low morale came up and Dankworth was asked if he was staying at NHS. He merely told his coworkers over lunch that he was unhappy and planned to leave NHS; there was no active recruitment. The other IT personnel left voluntarily because of job security concerns. Moreover, BCE failed to demonstrate how the departure of the IT department damaged NHS; the jury could have reasonably inferred that the IT jobs were about to be eliminated in any event by the transfer of the hardware and the department to Canada and Maryland.

Although some of the discussions and interactions between Masters and Simmons and Appellees certainly could approach the level of a breach of fiduciary duty, particularly where it seemed

---

[3]    Additionally, the jury could have (and apparently did) credit Dankworth's account of the improperly executed contract with Clarendon as mere negligence, or the product of the parties' preferred means of doing business. In light of Dankworth's continued loyalty to NHS after announcing his departure, this resolution of the disputed claims is reasonable and warrants deference to the jury's finding.

19

obvious that Masters and Simmons represented a nascent competitor to NHS, the jury could reasonably infer, in the absence of signed non-compete agreements or some evidence that Appellees were not considered at-will employees, that Appellees did not breach their fiduciary duty by engaging in good faith searches for new employment. Cf. Steelvest, 807 S.W.2d at 484-85 (finding jury questions where the fiduciary allegedly spoke to banks, potential investors, and employees and customers of the original employer with an eye toward creating a competing enterprise while still employed in a fiduciary position with the original employer).

Additionally, the jury could have reasonably determined that Dankworth's disclosure of NHS information was not a breach of his fiduciary duty. Dankworth testified that none of the documents he supplied to Clarendon bore confidential markings; he believed Clarendon was entitled to see and review its own policies and procedures from its own program with NHS and for what he reasonably believed was a future proposed project with NHS. Dankworth also thought if NHS's permission was needed for distribution, he was authorized to give it. A reasonable jury could have agreed with his version, particularly in light of the evidence that Dankworth was still attempting to procure contracts for NHS after his announced departure. Moreover, Appellees argued these policies and procedures contained no "secret" information and were available freely on the Internet. The documents contain fairly standardized information common to this type of program, which must conform to

20

strict guidelines to receive federal funding. The documents produced at trial comported with this description, and Appellees put on expert testimony to support their contentions as to all of these claims. In light of the conflicting evidence, BCE has failed to demonstrate error in the district court's denial of its j.m.l. and new trial motions on the fiduciary duty claims.

The same analysis applies to the breach of contract claim against Clarendon. By the express terms of the CHIP contract at issue here, Delaware law applies to this claim. The elements of a breach of contract under Delaware law are: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting damage to the plaintiff. H.M. Wexford LLC v. Encorp, Inc., 832 A.2d 129, 140 (Del. Ch. 2003).

The relevant contractual provision of both the CHIP and Healthy Kids contracts states:

> All confidential and proprietary information of a party, including, but not limited to, the terms of this Agreement, information about fees, computer software, business procedures and manuals, data, review criteria, contract rates, information collected and/or reports prepared pursuant to this Agreement, and any other information that a party identifies as confidential and/or proprietary ("Confidential Information"), will not be disclosed, published, disseminated or released without the prior written consent of the party owning the Confidential Information. Further, Confidential Information will be disclosed only to those persons and entities who have a need for the information in order to carry out the terms of this Agreement. Confidential Information will not be used in any way not specifically allowed under this Agreement. For purposes of this Agreement, Confidential Information will not include: . . . information provided to the other party with the

intention that it be published, disseminated, released or distributed by the other party to the Covered Persons, contract persons or the general public.

Plaintiff's Ex. 1, ¶5(a). At trial, Hagger confirmed that NHS never gave Clarendon written authority to disclose any confidential information to the state of Florida with the Florida Medicaid proposal. Dankworth admitted that the policies he removed from NHS and reformatted were developed by NHS staff in connection with CHIP. BCE argues that Dankworth's subjective belief that the policies were Clarendon's is not relevant to Clarendon's breach of contract. BCE points to the plain language of the contract as prohibiting Clarendon from disclosing, disseminating, or releasing "business procedures and manuals, data, [and] review criteria" without NHS's prior written consent. BCE also contends Hagger's testimony regarding his intent (he only signed the portion of the bid proposal that did not include the attached policies) is not relevant to Clarendon's breach of contract.

Clarendon responds that the jury had to make a determination based on disputed facts whether the policies and procedures attached to the proposal were indeed considered Confidential Information under the contracts. Moreover, the jury had to decide whether they belonged to NHS or Clarendon. Nothing in the contracts indicated which company owned the policies and procedures for CHIP and Healthy Kids. Dankworth and Freeman testified they were Clarendon's. Even if they were NHS's, there was a fact question as to whether Clarendon actually disclosed

22

Confidential Information. BCE argues that the policies and procedures submitted with the Florida Medicaid bid were business procedures and manuals; Clarendon disagrees and instead argues they were medical management policies and procedures that, even if covered by anything in the contract provision, would have been considered review criteria. Clarendon insists BCE presented no evidence that the policies attached to the Florida Medicaid bid were review criteria. Moreover, Clarendon argues the attached policies were not identified as confidential or proprietary by NHS, such that they could fall under the catchall phrase of the provision. Clarendon also argues that there was evidence that CHS and Bencomp would be considered "contract providers" under the contracts, thus information released to them was not considered Confidential Information under the provision.

In addition, Clarendon insists it raised a fact issue on breach itself because it was Dankworth (then working for NHS) who disclosed the policies to CHS (before he began working there), which actually assembled the bid. Finally, Clarendon argues the integral element of damages is entirely missing because any harm that BCE may have suffered came from its loss of the CHIP and Healthy Kids contracts; there is no connection at all, much less a detrimental one, to the bid on the Florida Medicaid program. According to Clarendon, that contract had not yet been awarded; there was no evidence of lost profits from that bid by BCE, nor any evidence of profits gained from that bid by Clarendon. There was

23

also no retained damages expert and no evidence by which the jury could value the policies and procedures obtained by Clarendon. See Univ. Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 545 (5th Cir. 1974) (noting damages can be shown through "evidence by which the jury can value the rights the defendant has obtained").[4]

We agree with Clarendon that a reasonable jury, drawing all plausible inferences in its favor, could have found several elements of breach of contract lacking. BCE did not present irrefutable evidence that the policies constituted Confidential Information; without proving this element, there was no contractual obligation. Additionally, there were various ways the jury could have determined who owned the policies, and which party, if any, disseminated or distributed the policies. Thus, even if the jury did find the element of damages met, by comparing the annual values of the terminated CHIP and Healthy Kids contracts, the jury reasonably may have found either no contractual obligation or no breach. We cannot disturb the jury's verdict on this issue.

**B. Challenges To Verdict Forms and Jury Instructions**

"Generally, a trial court is afforded great latitude in the framing and structure of the instructions and special interrogatories given to the jury." Barton's Disposal Serv., Inc. v. Tiger Corp., 886 F.2d 1430, 1434 (5th Cir. 1989). This court's

---

[4] Moreover, the district court permitted the vague damages calculations proffered by BCE at trial to be sufficient to take this claim to the jury in the first place. Had the jury found in BCE's favor, this point would be subject to a very careful review.

review is for abuse of discretion.  Id.  "Although we afford broad discretion in fashioning jury instructions, the trial court must nevertheless instruct the jurors, fully and correctly, on the applicable law of the case, and guide, direct, and assist them toward an intelligent understanding of the legal and factual issues involved in their search for truth."  EEOC v. Manville Sales Corp., 27 F.3d 1089, 1096 (5th Cir. 1994) (internal quotations, ellipses, and citations omitted).  "On appeal, the charge must be considered as a whole, and so long as the jury is not misled, prejudiced, or confused, and the charge is comprehensive and fundamentally accurate, it will be deemed adequate and without reversible error." Id. (citation omitted).

BCE does not complain that the district court incorrectly applied Kentucky law to the trade secret misappropriation claim. See KY. REV. STAT. ANN. §§ 365.880-365.900 (adopting and imposing the 1979 Uniform Trade Secrets Act ("USTA")).  BCE argues instead that the court erred by requiring proof of actual damages for the jury to issue a verdict in BCE's favor on liability because Kentucky law imposes no such requirement.  The USTA defines liability for trade secret misappropriation as the improper acquisition, disclosure, or use of a trade secret.  KY. REV. STAT. ANN. § 365.880.  BCE contends the plain statutory text makes no reference to, nor is a finding of liability dependent on, the existence of any proximate cause of damages.  That is, BCE maintains that after the threshold question of liability is determined, only then does the statute provide for

25

injunctive relief (§ 365.882), damages (§ 365.884), and attorney's fees (§ 365.886).

BCE contends the verdict forms concerning trade secret liability improperly required the jury to find proximate causation and short circuited consideration of the unjust enrichment claims by making those claims contingent upon earlier, unnecessary findings. Additionally, BCE argues Verdict Form Number 9, concerning fiduciary violations, was similarly defective in that it conditioned liability on the dual predicate that the offending conduct was "to the detriment of NHS for the benefit of himself or any other Defendant." BCE contends Kentucky law does not require proof of any damage to establish a fiduciary violation. See DSG, 754 F.2d at 682 (noting employee-fiduciary may be liable for nondisclosure "even if the employer has suffered no loss").

BCE also complains that the legal standard regarding unjust enrichment damages in the misappropriation instruction and forms was incorrect. The court instructed the jury:

> You may consider, in awarding such damages, one of the following measure of damages: (1) the profit, if any, received by a Defendant for the use of such trade secret; (2) the loss of profit, if any, suffered by Plaintiff for the use of such trade secret; or (3) the reasonable royalty for the trade secret appropriated.

R. 2279. BCE argues this constituted error because the court did not explain what "profit . . . received by a Defendant" meant and included a confusing paragraph on unjust enrichment at the end of the instruction. BCE contends an unsophisticated juror would not

26

have understood the relationship between profit and unjust enrichment. BCE notes the error was compounded because of the broad-form submission of the liability question.

We have granted the district court particularly wide discretion in instructing juries on misappropriation claims. See, e.g., Univ. Computing, 504 F.2d at 538 (noting every trade secrets case "requires a flexible and imaginative approach to the problem of damages").[5] We are aware of no controlling or persuasive caselaw that holds it is reversible error for a trial court to submit to the jury the broad question of liability together with the question of damages for misappropriation of trade secrets in one interrogatory. The Kentucky statute is silent; it does not prohibit such submission. Moreover, in light of the claims at issue (specifically BCE's request for monetary damages), it made sense for the court to submit the broad-form instruction. This interrogatory did not foreclose other types of relief, e.g., an injunction or attorneys' fees, but other relief is irrelevant in light of the failure to find liability.

Moreover, assuming arguendo the instruction forms improperly prevented the jury from considering unjust enrichment, the error was harmless. The applicable statute permits such

---

[5] Appellees first contend BCE failed to object adequately to the content of the trade secret verdict form and jury instruction, as required by FED. R. CIV. P. 51. Thus, Appellees argue this court's review is limited to plain error, and BCE cannot satisfy this "stringently limited" standard. See Horstmyer v. Black & Decker, Inc., 151 F.3d 765, 771 (5th Cir. 1998). BCE's proffered jury forms and instructions arguably do not preserve this error, but as we find no abuse of discretion, we will not employ the more restrictive standard.

damages only if that measure "is not taken into account in computing actual loss." KY. REV. STAT. ANN. § 365.884. The jury did not find any loss here, so there could be no error. Additionally, the jury instruction included a discussion of reasonable royalty as a possible measure of damages; this court has treated reasonable royalty as a subspecies of restitution-based relief. See Univ. Computing, 504 F.2d at 536-37. Additionally, the trade secret damages instruction properly included all possible types of damages under the statute. See KY. REV. STAT. ANN § 365.884.

As to the fiduciary duty question (Number 9), the court sustained BCE's objection to the joint submission of liability and damages and separated the damages issue in Numbers 11 and 12. Having prevailed on this argument at trial, BCE cannot show substantial and ineradicable doubt whether the jury was properly guided because of the "detriment" wording, much less that the jury was confused or misguided. As with the other instructions, even if these jury instructions were erroneous, BCE has not sufficiently demonstrated any harmful effect the purported error had on the outcome of the trial.

BCE further claims the instructions on damages were confusing to the jury. Although the verdict forms' discussion of damages might have seemed a bit repetitive to jurors, the instructions properly described all the various forms of damages possible, including the concepts of reasonable royalty and unjust enrichment referenced in the statute. There was no abuse of

28

discretion on damages.

BCE further argues the district court abused its discretion by refusing to instruct the jury regarding the confidentiality of medical policies submitted to the state of Texas for licensure. BCE contends that this refusal compromised BCE's ability to meet its burden to show that its policies and procedures were not generally available to the public. BCE notes that Appellees admitted at trial that they had no proof that the Texas licensing process resulted in any public disclosure to compromise the confidential nature of NHS's policies. However, Appellees argued that because the policies had been sent to the state, there had been "public dissemination" to deprive the policies of trade secret status. Texas law provides:

> Such written screening criteria and review procedures shall be available for review and inspection to determine appropriateness and compliance as deemed necessary by the commissioner . . . provided, however, that any information obtained or acquired under the authority of this subsection and article is confidential and privileged and not subject to the open records law or subpoena except to the extent necessary for the commissioner to enforce this article.

TEX. INS. CODE ANN. art. 21.58A, § 4(i). BCE maintains it proposed an instruction mirroring these confidentiality requirements. BCE argues CHS's views on whether such policies were confidential depended on whether they were BCE policies (not confidential) or CHS policies (confidential). BCE contends that in this situation, the district court's refusal to provide the requested instruction was contrary to law. Cf. Taco Cabana Int'l, Inc. v. Two Pesos,

29

<u>Inc.</u>, 932 F.2d 1113, 1124 (5th Cir. 1991) ("The district court correctly instructed the jury that '[f]iling of architectural plans with a city does not make them public information within the context of secrecy that relates to the law of trade secrets.'") (quoting the district court opinion).

The trial court instructed the jury adequately on trade secrets. The instruction's discussion of "general dissemination" and "matters in the public domain" was true and allowed the jury to determine whether NHS's policies were disseminated by state representatives of CHIP. BCE never objected to references made by NHS counsel in closing statements that NHS's policies were not secret because they were submitted for review by the Commission. Moreover, BCE has failed to show that the instruction given by the district court and the lack of the additional Texas law instruction harmed BCE and affected the case's outcome. BCE presented insufficient evidence to meet its burden. For example, BCE never provided evidence that the commissioner had reviewed NHS's policies. BCE did not present enough evidence to merit an additional instruction on confidentiality under art. 21.58A.

As to spoliation of evidence, BCE argues that CHS employee (formerly of NHS) Linda Shelburne, who started at CHS in March 2003, admitted that when changes were made to CHS policies, older versions were discarded and no one told her to preserve them. In order to receive a spoliation instruction, which allows (but does not <u>require</u>) the jury to draw an adverse inference against a

30

party, the party seeking the instruction must demonstrate bad faith or bad conduct by the other party. <u>See, e.g.</u>, <u>United States v. Wise</u>, 221 F.3d 140, 156 (5th Cir. 2000). BCE failed to make the requisite showing: The Post-It notes and flip charts used to create Care Management were not needed and were simply discarded after the programmers got the software into a semi-workable state and downloaded it into the master database. Additionally, the destruction of earlier versions of policies occurred because the only changes related to formatting and grammar. Moreover, the district court gave both parties the freedom to put forward evidence about document destruction; thus, the jury was free to consider BCE's contentions and punish Appellees accordingly. BCE did not show a substantial and ineradicable doubt that the jury was improperly guided, nor that the instruction would have affected the outcome. Any residual error was harmless. <u>See</u> <u>Caparotta v. Entergy Corp.</u>, 168 F.3d 754, 756 (5th Cir. 1999).

### C. Challenges To Evidentiary Rulings

A trial court's evidentiary rulings are reviewed for abuse of discretion. <u>Kelly v. Boeing Petroleum Servs., Inc.</u>, 61 F.3d 350, 356 (5th Cir. 1995). "When, as here, the district court has conducted, on the record, a carefully detailed analysis of the evidentiary issues and the court's own ruling, appellate courts are chary about finding an abuse of discretion." <u>Id.</u> The district court has wide discretion regarding expert evidentiary rulings;

31

this court reviews them for manifest error. <u>United States v. West</u>, 58 F.3d 133, 140 (5th Cir. 1995). "Considerable deference is to be accorded to the district court's evidentiary rulings and a ruling which admits or excludes evidence does not require reversal unless a substantial right of a party is affected." <u>Grizzle v. Travelers Health Network, Inc.</u>, 14 F.3d 261, 271 (5th Cir. 1994).

BCE argues that the court, over BCE's objections, repeatedly allowed wholly irrelevant testimony regarding the alleged morale at NHS, including testimony by Freeman, Dankworth, Barnes, and others. BCE contends the morale evidence did not meet the Rule 402 standard in that it did not tend to support or disprove any element of any claim. BCE argues that although tortious interference requires proof that the defendant acted without justification, morale is not an accepted form of justification such as competition, REST. (SECOND) OF TORTS § 768, nor does it constitute a good faith assertion of legally protected interest, <u>id.</u> § 773. BCE further contends that even if the evidence was deemed relevant, its probative value was outweighed by the danger of prejudice or confusion. <u>See</u> FED R. EVID. 403.

In response, Appellees argue all the evidence on morale and the deteriorating conditions at NHS under BCE's control was probative of the employees' state of mind and their reasons for leaving. Appellees contend the testimony tended to rebut BCE's offered reasons for their leaving, conspiracy, misappropriation, stealing contracts, and leading a mass exodus. Also, Appellees

32

note BCE asked for and received instructions on punitive damages for its claims — whether the acts were intentional, wilful and malicious. Appellees thus argue their testimony also rebutted scienter.

Based upon our review of the trial transcript, the district court properly allowed this evidence. The testimony concerned how the employees felt and reacted to the changes in BCE management practice; this was probative in rebutting BCE's claims that those employees acted improperly and with malice. In Kentucky, "it is clear that to prevail [on tortious interference] a party seeking recovery must show malice or some significantly wrongful conduct." Nat'l Collegiate Athletic Ass'n By and Through Bellarmine Coll. v. Hornung, 754 S.W.2d 855, 859 (Ky. 1988). "Morale" and other evidence may be probative of the question whether Appellees' conduct was "significantly wrongful" in this specific context. Thus, by persisting in this cause of action, BCE invited this exact type of testimony.

Finally, BCE argues, the court erred in prohibiting BCE's principal management witness, Spencer, from testifying about the company's profit margin on the CHIP contract. This evidentiary ruling had been deferred from a pretrial motion in limine to trial; Appellees objected to the evidence on the ground that BCE failed to file a timely Rule 26(a)(1) disclosure. We find no reversible error in this decision; BCE failed to comply with the discovery orders and further failed to remedy the concerns repeatedly raised

by the district court (during discovery, at the pretrial conference, and ultimately at trial) concerning damage calculations. The district court did not abuse its discretion in disallowing this testimony.

## III.  CONCLUSION

For the reasons discussed above, we **AFFIRM** the judgment of the district court.